951 A.2d 322

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Joseph Daniel MILLER, Appellee.**

Supreme Court of Pennsylvania.

Submitted April 22, 2008.

Decided July 23, 2008.

334

Amy Zapp, Esq., Francis T. Chardo, III, Esq., Dauphin County District Attorney's Office, for Commonwealth of Pennsylvania.

Billy Horatio Nolas, Esq., Defender Association of Philadelphia, Matthew C. Lawry, Esq., Federal Community Defender Ofc. for East Dist. of PA, Philadelphia, for Joseph Daniel Miller.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

PER CURIAM.

In this appeal, the Commonwealth challenges the order of a post-conviction court vacating Appellee's death sentences pursuant to *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the Eighth Amendment to the United States Constitution prohibits the execution of mentally retarded persons).

In 1994, Appellee was convicted of two counts of first-degree murder pertaining to the killing of Selina Franklin and Stephanie McDuffey. He received sentences of death, which were affirmed on direct appeal, *see Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310 (1995), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996), after which post-conviction relief was initially denied. *See Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592 (2000). After the United States Supreme Court issued its decision in *Atkins,* Appellee filed a second post-conviction petition contending that he is mentally retarded, and, therefore, ineligible to be executed. *See Atkins,* 536 U.S. at 321, 122 S.Ct. 2242.[1] The PCRA court initially granted relief without a hearing based upon the existing record. *See Commonwealth v. Miller,* 64 Pa. D. & C.4th 46 (Pa.Com.Pl.2003).[2] This Court, however, vacated this order and remanded for an evidentiary hearing specifically concerning whether Appellee is a mentally retarded person for purposes of *Atkins. See Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624, 633 (2005).

On remand, the Commonwealth filed a motion seeking recusal of the PCRA judge. This was based on explanations, contained in the PCRA (then trial) judge's 1993 opinions, of its refusal of Appellee's request to proceed to trial without a jury, as follows:

1. The petition asserted claims under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"), and sounding in habeas corpus.

2. The court relied primarily upon evidence developed at the penalty phase of Appellee's trial and in the prior PCRA proceeding, *see id.* at 69–81, since the degree of impairment of his intellectual functioning was a contested matter there.

> This case has been previously assigned to this Court for jury selection ... and trial.... The right to a non-jury trial is not absolute.... This Court has heard all of the numerous pre-trial motions which included testimony about [Appellee's] prior criminal record, other pending criminal charges, and other prospective criminal charges, *which makes this Court less than an impartial fact-finder.* ... In order to proceed to a prompt trial and in acknowledgement of the premiere requirement that a defendant's guilt or innocence be determined by an impartial fact-finder, the jury trial will proceed as previously scheduled....

*Commonwealth v. Miller,* No.1992 CR 2775, *et al., slip op.* at 25–26 (C.P. Dauphin Aug. 3, 1993) (quoting *Commonwealth v. Miller,* No.1992 CR 2775, *et al., slip op.* (C.P. Dauphin Mar. 2, 1993) (emphasis added)). The Commonwealth asserted that the references to the judge's inability to maintain impartiality created an appearance of impropriety and/or tended to undermine public confidence in the judiciary. The PCRA judge declined to disqualify herself, later explaining that:

> even a cursory review of the 1993 proceedings reveals my statement that I was "less than an impartial fact-finder" was limited to the issue raised at that time. Specifically, I held that my lack of impartiality applied to the issue of whether petitioner was guilty of the crimes charged (two capital murders and one kidnapping) due to the fact I had heard inadmissible evidence during the pre-trial proceedings and that as such, I could not and would not act as the fact finder in a bench trial. Accordingly, I denied petitioner's request that I determine his guilt and kept the case as scheduled for a jury trial....

> As is clear when read in context, my conclusion that I was "less than an impartial fact-finder" was not, nor was it ever intended to be, a blanket statement of my partiality for every potential fact issue that might later arise in this case. My partiality in 1993 arose because I was privy to numerous facts about petitioner's past that would have been inadmissible at a bench trial and which were prejudicial to a factual determination of petitioner's guilt in the capital murder

trial. Thus, the Commonwealth's interpretation of my 1993 pronouncement of partiality as applying to all fact finding issues is untenable. The Commonwealth has proffered no other bases for recusal outside of this ancient statement. *Commonwealth v. Miller,* No. CP–22–CR–2775–1992, *slip op.* at 6–7 (C.P. Dauphin Feb. 7, 2008).

The PCRA judge also opined, as follows, that the Commonwealth's failure to raise the issue earlier resulted in a waiver of the issue:

Though this court's alleged impartiality as a fact finder was announced to the world in 1993, the Commonwealth failed to seek recusal until fourteen years later, despite the fact that I was required to make fact determinations as early as the 1996–97 PCRA proceedings. Resolution of some of the many issues raised by petitioners in that proceeding involved taking testimony ... of eight witnesses and making fact determinations relevant to an assessment of claims of ineffective assistance of counsel.

The Commonwealth further sat on its claim for recusal when the Supreme Court, on December 27, 2005, vacated my prior order in which I found [Appellee] mentally retarded under the existing record. The Supreme Court remanded the action to permit the parties to develop relevant evidence of [Appellee's] mental retardation, including conducting and presenting expert examination and opinion regarding [Appellee's] condition vis-à-vis an *Atkins* determination. The case proceeded through 2006 and into 2007, with both sides conducting expert psychiatric and psychological examinations of [Appellee] and undertaking other discovery. It was not until June 13, 2007, on the virtual eve of the evidentiary hearings, that the Commonwealth finally acted in seeking my recusal based upon my statement from 1993. Since the Commonwealth failed to raise my alleged broad deficiency as a fact finder at any point prior to June 13, 2007, including during the 1996–97 PCRA proceedings, and later upon remand, throughout 2006 and the first part of 2007, the Commonwealth should be deemed as having waived the recusal issue.

*Miller*, No. CP–22–CR–2775–1992, *slip op.* at 8–9 (2/7/08); *accord Commonwealth v. Pappas*, 845 A.2d 829, 846 (Pa.Super.2004) ("It is well-settled that a party seeking recusal or disqualification must raise the objection at the earliest possible moment or that party will suffer the consequence of being time barred.").

At the hearings, consistent with the framework for review of *Atkins* claims enunciated in *Miller*, 888 A.2d at 629–31, Appellee presented evidence that he is mentally retarded under definitions employed by the American Association for Mental Retardation (now the American Association on Intellectual and Developmental Disabilities), and the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders. In general terms, the relevant criteria are: 1) limited or sub-average intellectual functioning; 2) significant adaptive limitations; and 3) age of onset as being prior to the individual's eighteenth birthday. *See Miller*, 888 A.2d at 630. Appellee's evidence included, *inter alia,* direct expert opinion testimony from Daniel Martell, Ph.D., and Jethro Toomer, Ph.D., and rebuttal testimony by John S. O'Brien, II, M.D., to the effect that Appellee is a mentally retarded person. *See* N.T., July 30, 2007, at 78, 123–24; N.T., July 31, 2007, at 123–24; N.T., August 17, 2007, at 12. All experts noted Appellee's sub-average intelligence as demonstrated by an intelligence quotient score of 58 upon recent testing by a Commonwealth expert. *See, e.g.,* N.T., July 30, 2007, at 38–40. Further, they referenced a history of Appellee's diagnosis as a mentally retarded individual, *see, e.g., id.* at 42, as reflected, for example, in his placement in special classes for educable mentally retarded children at various times during his youth. *See id.* at 53. Appellee's experts also found historical and persisting adaptive deficits in both general and specific areas, including conceptual, social, and practical domains; communications; motor skills; functional academics; self-direction; self-management; self-care; health; safety; and work skills. *See, e.g.,* N.T., July 30, 2007, at 56–78, 150–206. They noted that such deficits tend to be less pronounced in a structured setting such as a prison environment, *see* N.T., July 30, 2007, at 199, but

that Appellee continued to demonstrate material limitations on death row. *See id.* at 200. Further, they challenged the notion that a narrow focus on the prison setting is appropriate to the assessment of adaptive skills. *See id.* at 52.

The Commonwealth, for its part, conceded that Appellee met two of the three criteria necessary to a diagnosis of mental retardation (limited intellectual functioning and onset prior to eighteen years of age), *see* N.T., July 30, 2007, at 42. Therefore, its position focused solely on adaptive deficits. Commonwealth witness Steven Samuel, PhD, expressed the opinion that the relevant community for consideration of adaptive defects was the prison, death-row community. *See* N.T., July 31, 2007, at 347. According to Dr. Samuel, although Appellee was mentally retarded before he was placed on death row, *see id.* at 361–67, because he was able to manage and adapt well there, he should no longer be considered mentally retarded. *See id.* at 347–50, 356. Dr. Samuel conceded that he did not perform any standardized testing for adaptive deficits as recommended by the Diagnostic and Statistical Manual of Mental Disorders, but he explained that he did not do so because he believed such testing to be inappropriate to the prison environment. *See id.* at 381–82, 404. The following passages from Dr. Samuel's testimony under cross-examination by Appellee's counsel serve to summarize his testimony:

Q Under the [Diagnostic and Statistical Manual of Mental Disorders] criteria ..., to a reasonable degree of certainty Joey Miller was mentally retarded as a child, in adolescence, in adulthood, at the time of the crime, at the time of arrest, at the time of his trial, sentencing, and then up until when he is incarcerated and taken off to death row?

A That is correct.

Q And you hold that opinion to a reasonable degree of certainty?

A Yes, I do.

> Q And we covered how in that regard you are in agree-
> ment with all the other experts in the case who have
> said that?
>
> A Several times.
>
> Q You believe that he is, that the structure of the incarcer-
> ation has helped improve the deficits that he showed out
> in the real world?
>
> A Yes, I do.

N.T., July 31, 2007, at 427. On the Commonwealth's behalf, Timothy Michals, M.D., a psychiatrist, also testified along similar lines. He expressed the opinion, however, that Appellee's improvements began to manifest in his adulthood before prison, and they could be translated into the community setting were Appellee to be released. *See id.* at 470, 503.[3] The Commonwealth also introduced recorded conversations from prison which its experts testified demonstrated adaptive abilities on Appellee's part, including analysis of complex issues and manipulation of others, and referenced Appellee's criminal sophistication in carrying out his crimes undetected for years, escaping from a secure prison facility, and manipulating the criminal justice system.

The PCRA court's holding resolving the dispositive mixed question of law and fact was that Appellee "has established beyond a preponderance of the evidence that he is presently mentally retarded and has been, at all relevant times in the past, mentally retarded under *Atkins* [.]" *Commonwealth v. Miller*, Nos.1992 CR 2775, *et al., slip op.* at 6 (C.P. Dauphin Aug. 24, 2007). *See generally Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612, 615 (2007) (explaining that the issue of whether a capital petitioner is a mentally retarded person presents a mixed question of law and fact). The Commonwealth lodged the present appeal, confined to challenging the exercise of the PCRA judge's discretion in denying the motion to disqualify herself from the *Atkins* proceedings.

---

**3.** Apparently, there are differences in the literature concerning whether improvements in adaptive skills should alter a previously valid diagnosis of mental retardation. *See* N.T., July 31, 2007, at 482–83.

Initially, the Commonwealth does not contend that the PCRA judge was actually biased. Rather, it argues that the judge's comments and conduct created appearance issues which could impact upon public confidence in her handling of the *Atkins* proceedings and, more generally, in the administration of justice by the judiciary. While the Commonwealth recognizes the deference due to the jurist to whom a recusal motion is directed, it asserts that this Court is in at least equally as good a position to adjudge appearance matters and effects on public confidence. Therefore, the Commonwealth argues that this Court need not defer to the PCRA court's judgment in this regard.

The Commonwealth acknowledges that it had not previously objected to the PCRA judge's service as the trial judge, but it explains that such role in deciding matters of law differed greatly from her fact-finding role in the *Atkins* proceedings. *See Miller,* No.1992 CR 2775, *et al., slip op.* at 27 (8/3/93) (reflecting the PCRA (then trial) judge's explanation that "[t]here is a major distinction between impartiality as a fact finder and impartiality as to ruling on matters of law."). According to the Commonwealth, the PCRA judge's 1993 opinion clearly establishes that she felt capable of rendering impartial decisions of law, but not of fact. Furthermore, the Commonwealth stresses that the factually-laden question of whether Appellee is a mentally retarded person was strongly contested at the *Atkins* hearing. In this regard, the Commonwealth catalogues the evidence that it believes should have controlled the outcome, including: the testimony from its experts that Appellee is not presently mentally retarded under prevailing definitions due to improvements in his adaptive abilities; the recorded conversations from prison in which Appellee demonstrated such abilities; and the evidence of Appellee's criminal sophistication. The Commonwealth also alludes to the PCRA judge's actions as militating toward a finding that disqualification was warranted, including her decision to initially grant post-conviction relief from Appellee's death sentences without a specific *Atkins* hearing, and her skepticism concerning the relevance of Commonwealth evi-

dence tending to show Appellee's criminal sophistication. According to the Commonwealth, even Appellee believed that the PCRA court favored him, as, in another recorded prison telephone call, he mused that if the PCRA judge were removed from the case, he would surely be put to death.

In response, and in line with the PCRA court's explanation, Appellee focuses on the limited context of the PCRA (then trial) judge's statement concerning the effect of pretrial matters on her impartiality.[4] Indeed, Appellee notes that he himself had challenged, on direct appeal, the PCRA judge's impartiality in serving as trial judge, a capacity as to which her comments were more relevant, and this Court rejected such challenge. *See Miller*, 664 A.2d at 1321–22. Appellee also explains that, prior to the PCRA court's *Atkins* ruling, nearly all of the judge's rulings in pretrial, trial, sentencing, post-verdict, and post-conviction proceedings on factual and legal matters had been in the Commonwealth's favor, further dissipating any possible suggestion of bias against it.

With regard to the Commonwealth's contention that the PCRA court's conduct at the evidentiary hearing suggested potential partiality, Appellee first observes that this claim was not raised before the PCRA court. Appellee also develops the factual context of the incident of which the Commonwealth complains, coupled with the explanation that it is nearly impossible for a judge to preside over a hearing or trial lasting several days—particularly in an emotionally charged case such as the present one—without saying something that one party or the other would find objectionable. Appellee asserts that such comments have never been thought to form a basis for recusal. *See Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720

4. *See* Brief for Appellee at 39 ("[The PCRA judge's] knowledge at the time of trial of [Appellee's] prior record and other charges, together with her inability to set aside that knowledge at a trial on guilt-or-innocence, are utterly irrelevant to her ability to decide whether [Appellee] is a mentally retarded person under *Atkins*."); *see also id.* at 44 ("No reasonable, objective person—lay or otherwise—who did not take [the PCRA judge's] statement totally out of context could think that her pretrial knowledge of extraneous facts about [Appellee's] record would preclude her from deciding, years later, an issue that has nothing to do with his conviction at all, much less factual guilt or innocence.").

A.2d 79, 89–90 (1998) (concluding that a post-conviction judge's numerous "intemperate remarks were [not] unjustified or indiscriminate nor did they evidence a settled bias against [the a]ppellant"); *accord Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"). Additionally, Appellee emphasizes that the PCRA court duly conducted the evidentiary hearing directed by this Court, affording both parties ample opportunity to develop their respective positions on the *Atkins* question. With regard to Appellee's recorded conversation concerning his fear of a greater probability of being put to death should the PCRA judge step down, Appellee indicates that such expressions by a litigant should have little or no bearing upon a judge's personal decision on a disqualification motion or the appellate review of such a determination. Finally, Appellee advances the alternative position of the PCRA court that the Commonwealth's recusal claim is waived.

■■■■■ Under prevailing standards governing disqualification motions, the movant bears the burden of demonstrating bias, prejudice, or unfairness raising a substantial doubt as to the ability of the jurist to whom the motion is directed to proceed impartially. *Abu–Jamal,* 720 A.2d at 89. The judge determines whether she is able to proceed in an impartial manner and whether her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. *Id.* The appellate review is for abuse of discretion. *See id.*

■■ Upon our review, we conclude that the PCRA judge did not abuse her discretion in denying recusal. As she explained, her comments concerning her impartiality were made in the particular context of evaluating a request for a non-jury trial before her, when she had adjudged pre-trial motions relating information which would not be admissible at trial. The rubric she employed is consistent with language

used by this Court in pertinent opinions. *See, e.g., Commonwealth v. Sorrell,* 500 Pa. 355, 456 A.2d 1326, 1329 (1982) ("Having determined that exposure to the accused's criminal record during pre-trial proceedings would potentially taint the court's impartiality as a finder of fact, the court properly exercised its discretion in denying [the appellant's] request for a non-jury trial in the interest of his obtaining a fair trial."). We do not regard such language as being any broader than the purpose to which it is directed or as a basis for disqualification from post-conviction proceedings.

 We recognize that the *Atkins* matter was strongly contested by the Commonwealth, and that the PCRA court's order represents a final milestone in this protracted capital litigation. Nevertheless, it is apparent that the PCRA judge acted within her discretion in rejecting the grounds asserted in the Commonwealth's disqualification motion.[5]

The order of the PCRA court is affirmed.

**5.** Given our disposition, above, we need not consider Appellee's assertion of waiver. We do note, however, that the Commonwealth's claim that the PCRA judge's conduct at the hearings supports its recusal effort was not raised before the PCRA judge, and, therefore, is not appropriate for consideration here. The same is true of the Commonwealth's contention regarding Appellee's recorded statement about a higher probability of death being imposed were the PCRA judge to be replaced.