[J-73-2013] [MO: Stevens, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 675 CAP |
| | : | |
| Appellant | : | Appeal from the Order of the Court of |
| | : | Common Pleas of Philadelphia County, |
| | : | Criminal Division, on 6/28/2012 at No. CP- |
| v. | : | 51-CR-0933912-1986 |
| | : | |
| | : | |
| RICHARD HACKETT, | : | |
| | : | |
| Appellee | : | SUBMITTED: August 29, 2013 |

## CONCURRING OPINION

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED: August 18, 2014**

I join Parts I, II(A), and III of the Majority Opinion. The Court, in my judgment, properly reverses the PCRA[1] court's vacatur of appellee's death sentence on grounds that he is mentally retarded, and thus is death-ineligible under Atkins v. Virginia, 536 U.S. 304 (2002), which held that murderers proven to be "mentally retarded" cannot receive the ultimate penalty. The second claim (Part II(B)) asks the Court to consider a more basic question posed by cases such as this: whether the construct and approach developed for considering Atkins claims generally should be unthinkingly applied in cases involving a retrospective Atkins claim, i.e., a claim forwarded by a defendant never diagnosed with mental retardation in his minority, now collaterally attacking his

---

[1] Post Conviction Relief Act, 42 Pa.C.S. § 9541 et seq.

capital judgment. The Majority declines to alter the standard, concluding that such questions are better suited for the Pennsylvania General Assembly. In my view, and notwithstanding my joinder in the Court's primary Atkins analysis, several factors weigh in favor of considering the Commonwealth's second claim in tandem with any review of the propriety of the decision below: (1) this Court's central role in capital cases; (2) the Court's particularly central role in establishing both the substantive and procedural framework for Atkins claims, a circumstance forced upon us by the inaction of the General Assembly in the wake of Atkins; (3) the dynamic nature of this area where, for example, our most recent teaching in Commonwealth v. DeJesus, 58 A.3d 62 (Pa. 2012) was issued after the hearing and decision below; (4) the fact that the PCRA court had no authority to follow a different standard than what existed when its decision was rendered; and (5) our duty not to turn a blind eye to fraudulent claims. Indeed, as has often been the case in capital matters, our duty here should exist even if the Commonwealth did not specifically forward the claim.[2]

## I.

Atkins is a one-way exception to the High Court's otherwise core insistence upon individualized assessments in the penalty phase of capital trials. Under the scheme dictated by the High Court, a capital defendant's mental condition – including a variety of intellectual impairments – was, and after Atkins remains -- a relevant circumstance in mitigation. That is because, the High Court teaches, all capital defendants are constitutionally entitled to an individualized assessment, irrespective of the enormity of their crime, the gravity of additional aggravators, or the judgment of the states. Thus,

---

[2] Like the Majority, I will most often employ the term "intellectually disabled" in this concurrence except where, by necessity, the prior term makes more sense in a case litigated before the new term was adopted. See Majority Opinion, slip op. at 2, n.2.

the states are constitutionally forbidden to identify a single factor – say mass murders, or a murder committed by a prisoner already serving life imprisonment for murder -- as solely determinative of penalty. Atkins eliminated the individualized assessment paradigm -- but only in favor of defendants, and only for those murderers with a specifically proven intellectual condition: mental retardation under the DSM-IV, renamed intellectual disability under the DSM-V.[3] Despite the wide variety of possible intellectual impairments attending those with the condition, the Court has dictated that all are to be treated as if they were the same.

As a death-eligibility decision, Atkins reaches backwards in time, offering the prospect of relief for death-sentenced murderers whose judgments were final when Atkins altered the law, and who had an opportunity to present evidence of mental impairments or disabilities for individualized assessment. When Atkins was decided there were death-sentenced defendants, in Pennsylvania (such as mass murderer Harrison "Marty" Graham[4]) and elsewhere, who were removed from death row with no opposition or appeal from the government, since there was never any serious dispute that they were "mentally retarded" under the DSM-IV standard, and were so diagnosed in their minority. But, there are other defendants, such as appellee, who scored well above the cut-off range on multiple IQ tests in their minority and/or were never diagnosed with intellectual disability. The retroactive effect of Atkins obviously creates a powerful incentive for these defendants, their families, compliant mental health experts,

---

[3] The term "mentally retarded" is often cited as an example of a phenomenon that is coined a euphemism treadmill, whereby words introduced to replace offensive terms themselves become perceived as offensive over time. The phrase "euphemism treadmill" was introduced in 2002. STEPHEN PINKER, THE BLANK SLATE, 212-13 (2002).

[4] See Commonwealth v. Graham, 661 A.2d 1367 (Pa. 1995).

and defense counsel (in Pennsylvania, invariably the same institutional and well-heeled federal counsel) to pursue retrospective collateral claims of impairment premised upon slanted, exaggerated, or simply false evidence of disqualifying "intellectual disability."

In cases like this, involving retrospective claims of intellectual disability against a backdrop of testing occurring during the defendant's minority revealing no such disability, the defendant must not only present affirmative current evidence of his supposed true intellectual capacity decades ago, but must also contend with the lack of evidence of disability extant from his minority, where there was no Atkins-based incentive to slant the facts. And so, in this case, appellee, represented by the Federal Community Defender's Office ("FCDO") in the Atkins "trial" below, produced a parade of mental health experts, as well as family, friends and acquaintances, called not only to express their own opinions of appellee's alleged disability, but also to attack the diagnoses and opinions of others made, years ago, where there was no apparent motivation to exaggerate or prevaricate.

I write separately to emphasize that this particular subclass of retrospective claims of intellectual disability should be viewed with a very high degree of skepticism. Pennsylvania is obliged to implement Atkins; but, this Court is also obliged not to encourage or approve dubious or fraudulent claims, constitutional or otherwise. Unlike trial court judges in Pennsylvania, who may see a single retrospective Atkins claim in a career, this Court, with direct appeal responsibilities in all capital cases, is positioned to see a bigger picture. And, it has become apparent that the "science" surrounding a diagnosis of intellectual disability is highly subjective even in the best of circumstances. A retrospective claim of intellectual disability forwarded in order to defeat a sentence of death under Atkins does not involve reliable circumstances, much less the best of circumstances; the claim is susceptible to manipulation and bias, and trial courts must

be attuned to that fact. Thus, I agree with the Commonwealth that PCRA courts should not so cavalierly dismiss actual childhood evidence respecting intellectual disability just because a team of the usual defense experts, hired specifically in an effort to negate a final judgment of death, predictably hold a different view and prove intellectually very agile in dismissing all contrary evidence from the defendant's minority. Nothing in Atkins obliges states to vest in experts the power to remake the defendant's mental health history. This case presents a prime example of how a trial court, passing upon a single Atkins claim and either insufficiently appreciative of the full picture or predisposed to grant relief irrespective of the actual merit of the claim,[5] can easily be misled by slanted "expert" testimony.

In addition to the patent errors made by the lower court which properly lead the Majority to reverse, I do not believe that claims such as this are properly resolvable by generic reference to the discretion of the collateral review court. The notion that **retrospective** Atkins questions must be deemed properly resolvable by deference to supposed credibility determinations involving present-day experts who dismiss and debunk tests administered decades ago, memorialized without any incentive for inaccuracy, which contradict their Atkins-purpose retrospective opinions – a deference which one judge may indulge, but another judge reject -- is an exercise in studied pretense. I further explain my view below.

---

[5] The prior serial PCRA appeal in this case involved the lower court going to extreme lengths to award appellee a new trial premised upon a waived claim and a more than dubious legal theory. See Commonwealth v. Hackett, 956 A.2d 978, 989-91 (Pa. 2008) (Castille, C.J., concurring, joined by Eakin and McCaffery, JJ.), cert. denied, Hackett v. Pennsylvania, 556 U.S. 1285 (2009).

## II.

In this case, the only test suggesting that appellee had an IQ nearing the intellectually disabled range was a defense test administered solely for the purposes of proving a retrospective Atkins claim, and conducted when appellee was 44 years old, more than 20 years after his commission of murder. The definition of "mentally retarded" set forth in the DSM-IV (which this Court adopted in Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005)), requires age of onset of intellectual disability prior to age 18, a rule the Court dutifully enforced in Commonwealth v. Vandivner, 962 A.2d 1170, 1185 (Pa. 2009), cert. denied, 559 U.S. 1038 (2010). The DSM-V retains the age of onset requirement. A claim such as presented here, that a present-day test defense administered to appellee at age 44 solely for Atkins purposes, combined with the opinion of hired defense guns, requires that non-litigation-driven tests in childhood be ignored, should be approached with the extreme skepticism it deserves.

Appellee is represented on appeal by a well-regarded private attorney, who was also counsel of record below. FCDO counsel do not appear on the brief. But, make no mistake, it was the FCDO that controlled litigation of the Atkins claim before the PCRA court. The FCDO devoted three different lawyers to the PCRA hearings; appellee also made use of five mental health experts, all apparently answering to the FCDO: the correspondence from the defense experts is addressed to FCDO counsel and the experts are experts who routinely testify when the FCDO raises Atkins challenges or other claims implicating mental health.[6] The Court is familiar with the FCDO's penchant

---

[6] The four experts testifying in favor of appellee were:

(1) Dr. Barry Crown (PhD psychology), who was utilized to testify on behalf of defendants/ petitioners, represented by the FCDO or its earlier incarnation, in Commonwealth v. Williams, 61 A.3d 979 (Pa. 2013) (Atkins claim) (Allegheny County), Commonwealth v. Lesko, 15 A.3d 345 (Pa. 2011) (mitigating evidence claim) (…continued)

(continued…)
(Westmoreland County), Commonwealth v. Carson, 913 A.2d 220 (Pa. 2006) (same) (Philadelphia County), Commonwealth v. Wilson, 861 A.2d 919 (Pa. 2004) (same) (Philadelphia County), and Commonwealth v. Williams, 846 A.2d 105 (Pa. 2004) (same) (Philadelphia County);

(2) Dr. Carol Armstrong (PhD psychology) who was utilized by the FCDO, or its earlier incarnation, to testify in Commonwealth v. Miller, 987 A.2d 638 (Pa. 2009) (mitigating evidence) (Chester County), Commonwealth v. Zook, 887 A.2d 1218 (Pa. 2005) (same) (Lancaster County), Commonwealth v. Johnson, 815 A.2d 563 (Pa. 2002) (diminished capacity) (Berks County), Commonwealth v. Bracey, 787 A.2d 344 (Pa. 2001) (mitigating evidence) (Philadelphia County), and Commonwealth v. Stevens, 739 A.2d 507 (Pa. 1999) (same) (Beaver County);

(3) Dr. Daniel Martell (PhD psychology) who was utilized by the FCDO to testify in Commonwealth v. Robinson, 82 A.3d 998 (Pa. 2013) (mitigating evidence claim) (Lehigh County), Williams, 61 A.3d 979 (Atkins claim) (Allegheny County), Commonwealth v. DeJesus, 58 A.3d 62 (Pa. 2012) (same) (Philadelphia County), and Commonwealth v. Miller, 951 A.2d 322 (Pa. 2008) (same) (Dauphin County);  and

(4) Dr. John O'Brien (M.D. psychiatry) who was utilized by the FCDO or its earlier incarnation to testify in, *inter alia*, Commonwealth v. Ali, 86 A.3d 173 (Pa. 2014) (Philadelphia County); Commonwealth v. Roney, 79 A.3d 595 (Pa. 2013) (mitigating evidence) (Philadelphia County); Commonwealth v. Banks, 29 A.3d 1129 (Pa. 2011) (competency to be executed) (Luzerne County), Commonwealth v. Gibson, 19 A.3d 512 (Pa. 2011) (mitigating evidence) (Philadelphia County), Miller, 951 A.2d 322 (rebuttal testimony in support of Atkins claim) (Dauphin County).  It appears that Dr. O'Brien has also testified on behalf of the Commonwealth in, *inter alia*, Commonwealth v. Philistin, 53 A.3d 1 (Pa. 2012) (Philadelphia County), Commonwealth v. Keaton, 45 A.3d 1050 (Pa. 2012) (Philadelphia County), Commonwealth v. Birdsong, 24 A.3d 319 (Pa. 2011) (Philadelphia County), Commonwealth v. Watson, 952 A.2d 541 (Pa. 2008) (Philadelphia County), and Commonwealth v. Sam, 952 A.2d 565 (Pa. 2008) (Philadelphia County).

A fifth expert, Dr. Jethro Toomer (PhD psychology), did not testify but prepared a (flawed) report relied upon by Dr. Crown.  Dr. Toomer has testified in, *inter alia*, Roney, 79 A.3d 595 (mitigating evidence) (Philadelphia County), Williams, 61 A.3d 979 (Atkins claim) (Allegheny County), Banks, 29 A.3d 1129 (competency to be executed) (Luzerne County), Commonwealth v. Smith, 995 A.2d 1143 (Pa. 2010) (mitigating evidence) (Delaware County), Miller, 951 A.2d 322 (Atkins claim) (Dauphin County), and (…continued)

for raising such claims, often against the wishes of their "clients;" and, according to some clients, not all mental-health-based claims pursued by the FCDO are above-board, see Commonwealth v. Birdsong, 24 A.3d 319, 352-53 (Pa. 2011) (Castille, C.J., concurring), and some apparently are pursued only because the defendant declines FCDO intervention, leading the organization to claim the defendant must be mentally incompetent. Commonwealth v. Ali, 86 A.3d 173, 179 (Pa. 2014); Commonwealth v. Saranchak, 810 A.2d 1197, 1198 (Pa. 2002). See generally Commonwealth v. Spotz, 18 A.3d 244, 339 (Pa. 2011) (Castille, C.J., concurring, joined by McCaffery, J.).

The FCDO's vast federal resources, represented by its cadre of lawyers and roster of experts, are deployed throughout the Commonwealth; individual trial courts, and county prosecutors for that matter, who see only the occasional capital case, may be unaware of the bigger picture, and the strategy at work.[7] This extraordinary shadow capability of the FCDO, and its demonstrated tactics, give me additional pause when a retrospective Atkins claim is pursued by a defendant who was both subjected to objective tests in his minority, tests which plainly indicated he was not intellectually disabled, and was never otherwise diagnosed with the Atkins disability.

The fact that Atkins claims are peculiarly susceptible to manipulation becomes even more troubling if a court shows a naïve deference not only to the retrospective

---

(continued…)
Commonwealth v. Rainey, 928 A.2d 215 (Pa. 2007) (mitigating evidence) (Philadelphia County).

[7] The FCDO has refused to disclose to Pennsylvania courts their actual authority and funding to lawfully pursue capital matters in state court, causing further delay in a number of cases. See, e.g., In Re Proceeding in Which the Commonwealth of Pennsylvania Seeks to Compel, No. 2:13-cv-01871 (FCDO removed capital case questioning funding from Court of Common Pleas to U.S. District Court for the Eastern District of Pennsylvania); an appeal in that matter is pending before the Third Circuit in Commonwealth v. Defender Association of Philadelphia, No. 13-3817.

assessments and opinions of institutional experts, but also a deference to those experts' all-too-easy dismissal of the contrary findings of others, rendered decades ago, during the defendant's youth, and in circumstances where there was no incentive to falsely report. In this case, the FCDO's hired experts blithely dismissed appellee's childhood IQ test results (as well as other objective indicators of his intellectual capacity) on grounds that they supposedly had incomplete information regarding the circumstances surrounding the testing, did not know who administered the tests, or that the tests are unavailable to verify the data set and the scoring; as if the childhood testers had a burden to explain and justify themselves. A conscientious trial jurist should not fall for this sort of "junk science." Trial jurists should not be so naïve or quick as the PCRA judge here was to simply assume that the dismissive opinions of hired PCRA experts are a proper, much less persuasive, basis to simply ignore inconvenient, consistent, and unanimous contemporaneous accounts from the defendant's youth. Properly-qualified experts are free to offer their current opinions to a PCRA court, and they certainly can respond to cross-examination based upon the fact that what they believe is contradicted by all objective accounts from the defendant's youth. But, their expertise, properly understood, does not extend to establishing as fact which tests from the defendant's youth should be deemed legitimate or reliable. Indeed, in my view, the trial jurist here should have treated the defense experts' cavalier attitudes as proof itself that the retrospective Atkins claim was bogus.

### III.

The Atkins Court held that intellectually disabled individuals are exempt from the death penalty without announcing a national standard or prescribing a particular procedure for assessing the controlling status. Instead, the High Court left it to the individual states to devise how the exemption would be implemented. "The States

tasked with implementing <u>Atkins</u> have been faced with various gray areas…," <u>DeJesus</u>, 58 A.3d at 81, and the inexplicit constitutional standard, *i.e.*, "mentally retarded" or "intellectually disabled," is both difficult to apply and highly subjective.

The Pennsylvania General Assembly's response to <u>Atkins</u> has been silence, obliging this Court to implement the decision. We have provided trial courts with specific guidance respecting both trial level claims and retrospective claims raised on collateral review. <u>Commonwealth v. Sanchez</u>, 36 A.3d 24 (Pa. 2011); <u>Bracey</u>, 986 A.2d 128 (Pa. 2009); <u>Miller</u>, 888 A.2d 624 (Pa. 2005). This Court followed the DSM-IV's clinical definition inferentially approved in <u>Atkins</u> and held that, to establish a claim of mental retardation, the defendant must prove by a preponderance of the evidence: (1) substantial intellectual impairment; (2) impact of the impairment on the defendant's everyday life (significant deficits in adaptive functioning); and (3) manifestation prior to age 18. <u>DeJesus</u>, 58 A.3d at 76-77 (<u>citing</u> <u>Miller</u>). On appellate review, this Court employs a deferential standard considering whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. <u>Commonwealth v. Crawley</u>, 924 A.2d 612, 616 (Pa. 2007).

The High Court in <u>Hall v. Florida</u>, -- U.S. -- , 134 S.Ct. 1986 (2014), noted that many states utilize a three-part test similar to the DSM-IV test outlined in <u>Atkins</u>, and further acknowledged the "critical role [that states play] in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed." <u>Hall</u>, ___ S.Ct. at ___, 2014 WL 2178332, at *13. But, turning its one-way ratchet one notch tighter, the 5-4 decision in <u>Hall</u> narrowed the authority of the states to define intellectual disability, holding that states cannot rely on a fixed IQ test number (in <u>Hall</u>, 70) as conclusive evidence of a defendant's intellectual disability if that score falls within a certain range, *i.e.*, "the test's

acknowledged and inherent margin of error" – meaning, in practical terms, if IQ tests reveal an IQ of 75 or lower. This restriction exists, inexplicably according to the Hall majority, because "Atkins did not give the States unfettered discretion to define the full scope of the constitutional protection." Id. at *8-9, *13-15. The Court thus held that the Eighth Amendment requires states to permit a petitioner with such a demonstrated IQ to present additional evidence of mental retardation, including testimony regarding adaptive functioning deficits. Id. at *15.

Hall sheds no light on this case; nor does it address the problem inherent in retrospective assessments of intellectual disability for Atkins purposes. In Miller, this Court already acknowledged that an IQ score or scores falling within a particular "range" (65-75) will be considered; we are compliant with Hall. In this case, the results of IQ tests performed during appellee's minority were far removed from the range indicating intellectual disability. And, the Hall Court had no occasion to address the fact that retrospective assessments of intellectual disability are difficult, highly subjective, and subject to manipulation.

The mentally retarded/intellectually disabled standard is difficult to apply, even in cases without an incentive to skew the facts; it does not admit to the certainty of, for example, an age cut-off. See, e.g., Roper v. Simmons, 543 U.S. 551 (2005). Instead, an Atkins claim turns upon the results of IQ tests and evaluations, and other evidence speaking to the defendant's minority. This lack of certainty is amplified when courts are asked to retroactively determine the issue. Death row inmates attempting to prove the diagnosis retroactively typically present testimony from experts who administer or review new tests to establish a present IQ level, and then extrapolate backwards, then offer opinions reflecting on the defendant's minority, and finally comment on the results of the tests and evaluations administered during the defendant's minority, which were

undertaken not for the non-Atkins purpose of assessment and education, but instead for avoidance of the death penalty. The stakes are as high as it gets; and the defendant, as here, knows full well that low test scores advance his prospects. This is another one-way ratchet: As the Commonwealth's expert explained: "it's very easy to lower an IQ. You can be depressed, just not motivated…. But you can't be dull and actually pretend to be intelligent." N.T., 11/17/2011, at 52. This obvious fact raises a question whether appellee's defense-produced IQ score of 57 should even be considered in light of two childhood tests that placed his IQ in the 80-85 range, tests that were supported by a third test of appellee in his early adulthood, where he scored an 82. Thus, the Majority is correct to find that the PCRA court erred when it determined that appellee met the intellectual functioning prong of the Miller test.

The Atkins standard is also highly subjective: the Court has already seen that different experts in the field routinely reach abjectly opposite conclusions respecting who is intellectually disabled, at least for purposes of death penalty ineligibility. And, it would be irresponsible to ignore that the personal beliefs of the expert, who obviously knows the consequences of his testimony, may influence the opinion. Equally as troubling is that it appears that the relevant "experts" cannot even agree on basic parameters, such as what causes intellectual disability. For example, in Williams, 61 A. 3d 979, an expert[8] for the defense testified (quite logically, in the mind of this author) that mental retardation "was formed from a brain injury known as 'static encephalopathy,' which occurs at the end of pregnancy, at the time of delivery, or during very early stages in life, and is not the result of childhood abuse." Id. at 986. Yet, in this case, this seemingly basic "cause" and age of onset played no role in the defense case

---

[8] The expert was Dr. William Musser, a neurologist and psychiatrist who was part of the John Merck Program at Western Psychiatric Clinic located in Pittsburgh, Pennsylvania.

or the PCRA judge's conclusion. Instead, appellee presented testimony from two different experts who testified that his exposure to toxins and the extracurricular activity of boxing **in his teens** factored into their retrospective diagnosis of mental retardation. Employing factors like exposure to toxins or voluntary participation in activities potentially harmful to the brain in one's teens is incompatible with the testimony in Williams that the brain injury causing intellectual disability is organic and occurs very early in life. This is but one ready example of the apparent *ad hoc* subjectivity of the expert "science" surrounding intellectual disability in the Atkins retroactive diagnosis scenario.

Furthermore, to the extent that exposure to environmental factors and behavioral choices in one's teens result in brain damage or injury, the result should be a diagnosis of something other than Atkins-style intellectual disability, at least under the current reach of Atkins. Similarly, the notion that environmental and behavioral factors affect and cause intellectual disability necessarily calls into question the relevance of IQ tests purporting to prove intellectual disability that are conducted decades after a defendant's minority. Notably, appellee's experts here, in deeming the defense-administered IQ test score of 57 to be both controlling and adequate to negate the much earlier and better scores appellee achieved in his youth, did not purport to account for environmental and behavioral events in appellee's life in the 26 years that elapsed since he was 18, post-age-of-onset events which, under the defense theory, may have accounted for the significant decrease in appellee's performance. Even assuming the legitimacy of the defense theory that environmental and behavioral factors are relevant to assessing Atkins style intellectual disability, the defense cannot have it both ways. In my view, as a matter of law, the defense test result produced here was not even relevant to establishing whether appellee was intellectually disabled before age 18. Appellee may

today have some sort of intellectual disability; but that does not mean he had the specific disability that falls within the narrow ambit of the exemption set forth in Atkins, which was strictly limited to those who suffered from intellectual disability manifesting before the age of 18.[9]

In my view, the PCRA court failed to take these realities into consideration when it fell for the diffuse FCDO presentation here.

## IV.

I also write to note that the Court's decision in DeJesus, which was handed down after the PCRA court ruling here, should help lower courts facing retrospective Atkins claims to avoid the errors made by the judge below. DeJesus involved, *inter alia*, a Commonwealth challenge to the propriety of the three-factor test used to determine mental retardation approved in Miller in cases involving retrospective assessments; the Commonwealth argued for a more objective standard, and also challenged the "preponderance of the evidence" burden of proof standard, arguing for the more rigorous "clear and convincing" standard. The DeJesus Court ultimately reaffirmed the standards set forth in Miller, but offered further guidance when confronted with the prospect of a malingerer or when there is no diagnosis of relevant intellectual disability during the defendant's youth and the claim of Atkins disability is raised retrospectively on collateral review.

The DeJesus Court noted that in Ex Parte Briseno, 135 S.W.3d 1 (Tex.Crim.App. 2004), the court articulated seven factors it deemed relevant in weighing Atkins evidence related to adaptive functioning. The Briseno court explained that the adaptive

---

[9] Apparently, the Dissenting Opinion would view the multiple inconsistencies in appellee's agile Atkins theories as mere credibility matters.

behavior criteria were exceedingly subjective, and "undoubtedly experts will be found to offer opinions on both sides of the issue in most cases[.]" Briseno, 135 S.W.3d at 8. Because of this reality, the Briseno court offered its evidentiary factors to guide the analysis. Id.

Notably, this Court in DeJesus found these seven factors to be particularly apt where no formal diagnosis of intellectual disability was made prior to age 18 and the disability claim was forwarded strictly in the context of seeking Atkins relief, noting that in such circumstances "there [was] a powerful incentive to malinger and to slant evidence." DeJesus, 58 A.3d at 85. We concluded that these ulterior motives were a relevant consideration to argue to the Atkins fact finder, "not only for purposes of assessing the defendant's post-Atkins intelligence and aptitude test results, but also in assessing the defendant's overall case for Atkins relief." Id. The Court indicated that while the Briseno factors were helpful, the factors would not be elevated to any particular favored or presumptive status; we left it to the finder of fact to determine whether the Briseno factors should be employed and the weight to be given to them in an individual case. Id. at 85-87.

The seven factors identified in Briseno court were as follows:

- Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

Briseno, 135 S.W.2d at 8-9. The DeJesus Court did not itself address the factors in application, since we were remanding for further proceedings.

More recently, in Williams, the Court noted that DeJesus was applicable when the trial court determined the Atkins claim in post-conviction proceedings. The Williams Court, however, did not find that the Briseno factors were implicated because the Commonwealth did not raise a claim of malingering.

The case *sub judice* squarely presents an opportunity to consider how the Briseno factors could help trial courts avoid errors. The Commonwealth here has argued all along that appellee is malingering; the Commonwealth emphasizes that appellee was never considered mentally retarded in his youth; and, in fact, the test scores from appellee's childhood show that his IQ was in the low to mid-80's, which is well above the recognized IQ standard for intellectual disability (70, with a margin of error of plus or minus 5). The Briseno factors, properly applied here, weigh against any finding that appellee suffered from limited adaptive functioning.

Respecting the first factor, appellee was never diagnosed as "mentally retarded," nor was he labeled mentally retarded by a teacher or school administrator. Instead, the school records establish that he was considered "brain injured," which is not the same thing. Testimony from Dr. Paul Spangler, who was employed as a psychologist at the Elwyn Institute outside of Philadelphia from 1971 to 1976, testified that the Ashbourne School that appellee attended specialized in educating students with brain injury who had a diagnosis of "minimal brain dysfunction." N.T., 11/17/11, at 10. Dr. Spangler further testified that students diagnosed with "mental retardation" were not normally admitted to the Ashbourne School; instead, the special school was for students identified similarly to appellee, as being dull/normal or of low average intelligence, and

not mentally retarded. Id. at 12-15. Testimony and affidavits from appellee's family members and childhood friends similarly suggested that he was "slow;" being classified as "low-average" intelligence or identified by peers and family members as being slow is not the same as being mentally retarded/intellectually disabled.

The second factor looks at whether the person formulated plans and carried them through. The evidence at the PCRA proceedings relating to appellee's business acumen as well as the evidence surrounding the murder weigh strongly against appellee's retrospective claim on this factor. Before the age of 18, appellee managed to develop a small-scale lawn-mowing business which he grew into a thriving landscaping business, which later included snow removal. The business eventually grew to include an office, two full-time employees, and three part-time employees, including a receptionist who worked on Saturdays. Appellee bought his first truck for the business at age 16 and was able to purchase another vehicle at 18. There was testimony that appellee received help from his mother and father related to bookkeeping and purchasing equipment. However, additional testimony suggested that appellee took charge of all of the scheduling, as well as writing estimates for potential customers. Even assuming that appellee received help related to the administrative aspects of his business, the fact remains that he ran a successful small business from the time he was sixteen until the time of the murder, which occurred a week before his twenty-second birthday, plainly demonstrating an ability for formulate plans and carry them through – and all at a time where he had no incentive to hide his actual intellectual functioning.

Furthermore, the facts of the underlying crime show that appellee was capable of formulating a plan and carrying it through: he contacted a friend to help him find a hitman to "bump someone off for money." The Commonwealth also demonstrated that appellee and his co-conspirator actually hired someone to commit the murder, but that

the hired killer backed out because he disagreed with the proposed attack. Commonwealth v. Hackett, 627 A.2d 719, 721-22 (Pa. 1993). Certainly, contacting a third party to help him find a hitman, and later hiring a hitman, shows – better than the retrospective opinion of a hired expert -- the ability to formulate a plan and carry it through.

The third factor considers whether the defendant was a follower or a leader. Again, returning to the examples discussed above, appellee ran his own landscaping business and established a plan to hire a hitman to kill Gregory Ogrod – plain indications that he was a leader. Testimony from the receptionist for his business established that he hired her as a favor, because she needed the money, suggesting that he was able to control and organize his business. Similarly, testimony from the PCRA hearing also showed that appellee had taught himself about short-selling stocks while he was in prison. Even though his understanding and explanation of short-selling might have been basic, taking the initiative to learn about such a concept shows leadership. And, finally, there was testimony concerning appellee's ability to manipulate others, securing for himself free lodging, and misleading his probation officer so he could visit his beach home.

The fourth factor considers whether a defendant's conduct in response to external stimuli is rational and appropriate, even if socially unacceptable. In this case, it was clear that appellee wanted to kill Gregory Ogrod because the two men did not get along. Appellee moved into a house with Ogrod and Ogrod's brother (who was also appellee's employee). Ogrod did not like that appellee was not paying rent and the living arrangement "went bad." Hackett, 627 A.2d at 721. Appellee's response – to kill Ogrod -- was obviously socially unacceptable, but it offered appellee the prospect of the

result he desired -- he would no longer have to live with Ogrod, but would be able to continue living in the house.

The fifth factor, which relies on consideration of appellee's response to oral and written questions, is irrelevant as there is nothing in the record speaking to the circumstance.

The sixth factor takes into account whether the person can hide facts or lie effectively. Again, turning to the circumstances surrounding the crime, it is clear that appellee knew what evidence could be used against him; he made sure that the photographs he had given to his friend for purposes of hiring a hitman were destroyed; he asked his girlfriend to lie on his behalf; and he also discarded the crowbar used in the murder in a dumpster a week after the crime. Hackett, 627 A.2d at 722. Additionally, at the PCRA hearing, testimony suggested that appellee had lied to the court related to a prior breaking and entering conviction when he told the court he had landscaping contracts at the shore so that he could continue to go to his shore house on weekends while he was on work release. N.T., 11/16/11, at 27-28. Appellee's conduct satisfies this factor.

Finally, the seventh factor considers whether the crime itself required forethought and planning. As already discussed, appellee and a co-conspirator (Marvin Spence) conspired to kill Ogrod and his girlfriend (if she got in the way).[10] Appellee approached a friend about hiring a hitman. When that avenue was unproductive, Spence approached a third party who appellee and Spence actually "hired" for the job. When that alternative fell through, appellee, who had a key to the house, armed Spence (and two other co-conspirators) with knives and a crowbar to attack Ogrod and Dunne while they were sleeping. The circumstances amply demonstrated forethought and planning;

---

[10] As it happened, the girlfriend, Maureen Dunne, was the unfortunate murder victim.

indeed, appellee approached his friend regarding a hitman in the spring of 1986, yet the killing occurred much later, on July 31, 1986. Furthermore, the circumstances of the actual crime show that appellee armed his co-conspirators prior to going to the murder scene, let the co-conspirators into the house, and intentionally approached the victims at a time they knew the victims were sleeping. Hackett, 627 A.2d at 722. The crime itself, and the various attempts to commit murder, required forethought, planning, and patience; they were not the result of any impulsive behavior on appellee's behalf.

I would conclude that the adaptive functioning limitations found by the PCRA court, and discussed in great detail by the Majority and Dissenting Opinions, when considered in conjunction with the Briseno factors discussed above, do not at all support the PCRA court's finding that appellee suffered from significant adaptive limitations, as was required to establish intellectual disability by a preponderance of the evidence. The court's decision below is unsupportable, and therefore, reversible.

**V.**

Finally, I write in respectful response to the Dissenting Opinion's rejoinder, which characterizes my position as reflecting only a concern with the conduct of the FCDO, and further claims that I am "disregard[ing] the most basic facet of appellate review," *i.e.*, deference to credibility determinations of the PCRA court. Dissenting Opinion, slip op. at 2, n.2, 13-14 (Baer, J.).

I respect that some members of the Court turn a blind eye to the questionable conduct of the FCDO, but my concerns with the FCDO here are expressed only as they relate to a broader question, which the dissent never confronts. My jurisprudential concern – not a new one in this area -- is directed at the proper review paradigm when a court is faced with a retrospective Atkins challenge, and where (unlike with a murderer

such as Marty Graham) there were no findings (or here, even indications) of <u>Atkins</u>-style intellectual disability manifested during the defendant's minority.

The unanimous decision in <u>DeJesus</u> suggests that this Court is not naïve: retrospective <u>Atkins</u> claims are particularly ripe for fraud and abuse. I was the author of <u>DeJesus</u>. My position here, which is unconstrained by the responsibilities of majority authorship (as are the dissent's views), follows logically from <u>DeJesus</u>, with a greater appreciation of what our continued experience with <u>Atkins</u> claims and records – such as this one -- reveal. The issues are not so simple as the dissent pretends.

The Court's first foray into the <u>Atkins</u> arena resulted in a decision deferring the question to collateral review because the trial record addressed mental retardation for other purposes, and was not directed at establishing an <u>Atkins</u> claim. <u>Commonwealth v. Mitchell</u>, 839 A.2d 202 (Pa. 2003). Although unstated in <u>Mitchell</u>, in the disruptive wake of <u>Atkins</u>, there obviously was an expectation that the General Assembly would act, since <u>Atkins</u> deferred the implementation of its new rule to the individual states. The General Assembly is obviously better positioned to consider the variety of issues attending <u>Atkins</u>, including the most basic question of the operative definition of mental retardation/intellectual disability, burdens of proof, etc. <u>See</u> <u>also</u> Majority Opinion, slip op. at 44-45. Indeed, the General Assembly was free to go farther than the minimal <u>Atkins</u> command.

The Legislature has failed to act, however. Faced with this void and the reality of ripe <u>Atkins</u> challenges forwarded in discrete cases, this Court set forth a standard to review claims of mental retardation on collateral review in <u>Commonwealth v. Miller</u>, 888 A.2d 624 (Pa. 2005), as well as the standard of appellate review in <u>Commonwealth v. Crawley</u>, 924 A.2d 612 (Pa. 2007). Thereafter, we answered procedural and substantive questions governing such claims on collateral review in <u>Commonwealth v. Bracey</u>, 986

A.2d 128 (Pa. 2009), as well as the governing standards and procedures for Atkins claims at trial in Commonwealth v. Sanchez, 36 A.3d 24 (Pa. 2011). Finally, as discussed above, we reaffirmed that Atkins claims must be established by a preponderance of the evidence, and suggested that a collateral review court may consider the Briseno factors. DeJesus, 58 A.3d at 84-88.

This is, in short, a dynamic area. Our most recent decision, relevant here, is DeJesus; and the PCRA court did not have its benefit. To turn a blind eye to complications as they arise in this area can become an abdication of responsibility. In my judgment, the DeJesus Court's recognition of the prospect of fraudulent retrospective Atkins claims is a reality in this case. Thus, I have addressed it. I go on to suggest an appropriate review paradigm given the realities of retrospective Atkins litigation, adjustments consistent with our decision in DeJesus, and I apply DeJesus here.

Continuing in its studied simplicity, the dissent also alleges that I have disregarded the evidentiary "value" of expert opinions which, the dissent generically says, can be sufficient to support a finding of fact. The dissent then states that when appellee's hired experts testified that appellee met the clinical definition of intellectual disability, and simply dismissed the contrary evidence from his youth (while articulating a self-contradictory view on environmental factors affecting IQ test performance), appellee presented sufficient evidence of that "fact," rendering the PCRA court's Atkins conclusion unreviewable. Dissenting Opinion, slip op. at 13-14. If only responsible judging were so simple. In addition to the points I have already made, I would note that, in fact, the ultimate determination of mental retardation (intellectual disability) is a mixed question of law and fact. Crawley, 924 A.2d at 615. If the court gets the law wrong –

including the proper way to look at evidence in the circumstances, and the proper bounds of so-called expert evidence – no deference is due.

The dissent has merely dipped its toe into the shallow end of this particular, deep pool of water. The trial court "credited" a thoroughly bogus retrospective Atkins claim. I join the Majority's mandate for this additional reason.