J-E03004-14

2015 PA Super 267

| | |
|---|---|
| ROY H. LOMAS, SR. D/B/A/ ROY LOMAS CARPET CONTRACTOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMES B. KRAVITZ, ANDORRA SPRINGS DEVELOPMENT, INC., CHERRYDALE CONSTRUCTION CO., EASTERN DEVELOPMENT ENTERPRISES, INC., AND KRAVMAR, INC. | |
| Appellants | No. 2391 EDA 2011 |

Appeal from the Judgment Entered August 16, 2011
In the Court of Common Pleas of Montgomery County
Civil Division at No: 00-5929

BEFORE:  BENDER, P.J.E., BOWES, J., PANELLA, J., DONOHUE, J., SHOGAN, J., ALLEN, J., LAZARUS, J., WECHT, J., and STABILE, J.

CONCURRING AND DISSENTING OPINION BY STABILE, J.:

**Filed:  December 21, 2015**

I join the Majority's[1] opinion insofar as it affirms the liability verdict. For the following reasons, I would vacate the damages verdict and remand for a new damages trial in front of Judge from outside of Montgomery County.

In my view, the Honorable Thomas P. Rogers of the Montgomery County Court of Common Pleas erred in denying Appellants' motion to recuse the entire bench of the Montgomery County Court of Common Pleas

---

[1]  I will refer to the opposing opinion as the Majority opinion based on our unanimous affirmance of the liability verdict.

1

from hearing the damages trial in this action. This is so because the Honorable Thomas C. Branca, Judge Rogers' colleague on the Montgomery County bench, has a substantial financial interest in the outcome of this case based on his former representation of Appellee. While I do not doubt Judge Rogers' ability to render a fair and impartial verdict, I also do not believe he could preside over this matter without creating an appearance of impropriety detrimental to the public's faith in the fair and impartial operation of the courts. Under the circumstances of this case, the same is true for every judge of the Montgomery County Court of Common Pleas.[2] I believe the trial court dismissed and ignored the independent consideration of an "appearance of impropriety" that must be considered under a recusal motion.

This matter originally commenced as an arbitration demand by Appellee for an unpaid contract balance of $30,913.00. After other compensatory damages, interest, attorney's fees, and costs were added to the contract balance, the arbitration award was confirmed as a judgment for $200,601.61. Appellee then commenced this action to collect the judgment.

---

[2] Contrary to the Majority's assertion, I believe this dissent provides ample guidance, based upon available legal precedent, to require recusal of the entire Montgomery County bench. The number of judges *per se* that share a common bench is not determinative of this issue. Rather, as explained, it is the appearance of impropriety of any one of them hearing this matter that is problematic. In a sense, requiring recusal of the entire county bench is similar to the rule of imputation whereby all lawyers of a firm must disqualify from a matter if any member of the firm is prohibited from doing, except where the prohibition is based upon a personal interest of the prohibited lawyer. **See** Rules of Professional Conduct 1.10.

These proceedings were bifurcated between liability and damages. The recusal issue in this case concerns the damages trial wherein Judge Rogers increased the final arbitration award of damages to Appellee to $1,688,379.10. A substantial component of this award was the result of Judge Rogers exercising his discretion to award punitive damages of three times the arbitration award of $200,601.61 to Appellee. To this, he added attorney's fees, additional interest, and statutory penalties. He did so at a time when he knew Judge Branca, a judicial colleague of his on the Montgomery County bench, would directly and proportionally benefit from the size of any increased award entered in the case. Contrary to prior statements that Judge Branca had been paid in full for his prior representation of Appellee, it became known during Judge Branca's testimony in the damages trial that he was in fact to receive a thirty-percent contingent fee of any net recovery.

Judge Rogers denied Appellants' motion to recuse on the basis that Appellants did not establish actual prejudice or bias on his part in presiding over these proceedings. Trial Court Opinion, 12/31/08, at 10. He further rejected any argument that an "imputed appearance of impropriety" by virtue of Judge Branca's pecuniary interest supports a conclusion that Appellants "cannot receive, have not received or will not continue to receive" a fair and impartial trial in Montgomery County. *Id.* at 11.

I would reverse the trial court's recusal ruling because the appearance of impropriety alone forms an independent basis for recusal even when no actual bias, unfairness, or prejudice is shown on the part of a trial court judge. I am mindful that our case law has not always spoken with clarity on the standard for recusal, as will be discussed, *infra*. Accordingly, I find it necessary to review the evolution of the "appearance of impropriety" in our recusal standard before explaining the indispensable importance of this standard and why I believe the motion to recuse the entire Montgomery County bench should have been granted.

## History of the Appearance of Impropriety Standard

The mandatory avoidance of an "appearance of impropriety" in judicial decision-making has a long and storied history in our nation. By most accounts, this standard first was articulated as a judicial standard under the ABA's Canons of Judicial Ethics promulgated in 1924.[3] The 1924 Canons reminded judges to avoid the appearance of impropriety in all professional and personal activities.[4] The impetus for the ABA promulgating this Canon

---

[3] **See** Raymond J. McKoski, *Judicial Discipline and the Appearance of Impropriety: What the Public Sees Is What the Judge Gets,* 94 MINN. L. REV. 1914, 1921 (2010).

[4] **Id.**

lies in the fixing of the 1919 World Series.[5]  Many felt at the time that gambling and bribery were corrupting the country's national pastime.[6]  The ABA was motivated by the actions of Judge Kenesaw Mountain Landis, who accepted a job as the first commissioner of Major League Baseball while serving as a federal judge for the Northern District of Illinois.  Major League Baseball team owners appointed Judge Landis in response to the "Black Sox" scandal, in which eight Chicago White Sox players were accused of accepting money from professional gamblers to lose the 1919 World Series to the underdog Cincinnati Reds.  A jury acquitted the eight players of criminal wrongdoing, but Judge Landis banned them for life from the major leagues. Judge Landis' refusal to leave the federal bench while drawing a large salary as baseball commissioner prompted a censure from the ABA and talk of impeachment in Congress.[7]

Although they strongly disapproved of Judge Landis serving as a federal judge at the same time he was drawing compensation as baseball's Commissioner, the Judge's detractors, as well as the United States Attorney General, were unable to identify any law or ethics rule barring Judge Landis

---

[5]  **See** McKoski, **supra** note 9, at 1922.  **See also** Peter W. Morgan, *The Appearance of Propriety: Ethics Reform and the Blifil Paradoxes*, 44 STAN. L. REV. 593, 598 (1992).

[6]  McKoski, **supra** note 9, at 1922.

[7]  Judge Landis served as commissioner until his death in 1944.  **Id.**

from simultaneously holding both public and private employment.[8]  Further, there was no evidence the Judge's baseball duties interfered with his judicial duties.[9]  The ABA nonetheless, during the course of its Forty-Fourth Annual Meeting in 1921, proceeded to pass a resolution condemning Judge Landis for engaging in private employment while receiving a salary from the federal government.[10]  In the ABA's opinion, this was conduct it considered "unworthy of the office of judge, derogatory to the dignity of the Bench, and **undermining public confidence in the independence of the judiciary**."[11] (Emphasis added).  In further response, the ABA issued the 1924 Canons, which included Canon 4, to encourage judges to avoid any professional or personal conduct perceived to damage the image of a judge. Canon 4, as adopted by the ABA in 1924, although not stated in mandatory terms, advised, "[A] judge's official conduct should be free from impropriety and the appearance of impropriety."[12]  We thus can see from the genesis of

---

[8]  McKoski, *supra* note 9, at 1923.

[9]  *Id.*

[10]  *Id.* at n.49.

[11]  *Id.*  It is interesting to note that none other than a Pennsylvanian to the ABA convention, Hampton L. Carson of Philadelphia, proposed this resolution of condemnation.  *See id.*  (citing REPORT OF THE FORTY-FOURTH ANNUAL MEETING OF THE AMERICAN BAR ASSOCIATION (September 1, 1921) at 61-67).

[12]  *Id.*  at 1925.

the "appearance of impropriety" standard, actual prejudice or bias was not a prerequisite to finding an appearance of impropriety.

In 1969, the 1924 Canons were revisited in response to a controversy surrounding United States Supreme Court Justice Abe Fortas.[13] Justice Fortas was to receive $20,000 as compensation to help the activities of a foundation.[14] When the Justice was paid, the foundation's director was under investigation by the Securities and Exchange Commission.[15] Justice Fortas returned his consulting fee and cancelled his agreement only after the director was indicted.[16] Public criticism of Justice Fortas accused him of raising a question about the appearance of virtue on the Court.[17] The ABA moved to censure Justice Fortas, finding his conduct to be contrary to the Canons of Judicial Conduct and, in particular, that his conduct was contrary to Canon 4's command that his conduct be free from impropriety and the appearance of impropriety.[18] Again, in response, the ABA moved to strengthen the judicial canons by moving Canon 4 to Canon 2, and adding that the appearance of impropriety standard would now serve as an

---

[13] *Id.* at 1926.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 1927.

[18] *Id.* at 1928.

enforceable rule of conduct.[19]  In 1990, the Code again was amended to strengthen Canon 2 by substituting "shall" for "should" to eliminate any doubt that the appearance of impropriety was now a mandatory prohibition.[20]  The Commentary to Canon 2 of the 1990 Code provided that "the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired."[21]

In 2007, after some deliberation and attempted amendments to demote the appearance standard to a guiding principle, the ABA, rejecting this approach, adopted Rule 1.2 of the Model Code of Judicial Discipline to provide "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."[22]  In addition, Comment 5 to Rule 1.2 was added to provide that "the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged

---

[19]  *Id.*

[20]  *Id.*  at 1931.

[21]  *Id.*

[22]  *Id.* at 1935.

in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge."[23]

It is significant that Pennsylvania's current Code of Judicial Conduct[24] mirrors Canon 2, Rule 1.2 and Comment 5 to the 2007 ABA Code. Avoiding the appearance of impropriety under Canon 2 to Pennsylvania's Code is mandatory. This prohibition is further reinforced under Rule 1.2 and Comment 5 to Rule 1.2, which provides a judge "shall avoid impropriety and the appearance of impropriety." Pa. Code Jud. Conduct, Canon 1, Rule 1.2, cmt. 5. Accordingly, there can be no doubt, in light of this history, and the current status of our Code of Judicial Conduct, that avoiding "impropriety" and the "appearance of impropriety" is not only important, but also mandatory in Pennsylvania.

## The Substantive Right to Request a Jurist's Recusal

Appellee would dismiss this history of the appearance of impropriety as irrelevant to the resolution of the present recusal dispute. Appellee argues that our Judicial Canons only serve as guidelines for jurists and do not have the force of substantive law. Appellee's Supplemental Brief at 18. Appellee argues both the Pennsylvania Supreme Court and this Court have repeatedly held the Judicial Code of Conduct is not the standard for recusal

---

[23] *Id.* at 1936.

[24] The Code of Judicial Conduct has been revised, renumbered and amended effective July 1, 2014.

motions, does not impose substantive legal duties on judges, and does not provide standing to anyone, including this Court, to seek compliance or enforcement of the Code. **Id.** While it is true that Pennsylvania's Judicial Code of Conduct does not vest substantive rights in litigants and may be enforced only by our Supreme Court under Article 5[25] of the Constitution of this Commonwealth, it also is true that litigants have a substantive right to request recusal when a litigant has reason to question the impartiality of a jurist. **Goodheart v. Casey**, 565 A.2d 757, 762 (Pa. 1989), **Reilly v. Southeastern Pennsylvania Transp. Auth.**, 489 A.2d 1291, 1298 (Pa. 1985). The "appearance-of-impropriety" standard, while originating under canons of judicial conduct, has been adopted as a part of our substantive law and, as will be shown, is a necessary component of due process.

In **Caperton v. A.T. Massey Coal Company, Inc.**, 556 U.S. 868 (2009), the United States Supreme Court reviewed whether Justice Brent Benjamin of the West Virginia Supreme Court of Appeals, who received extraordinary campaign contributions from the board chairman and principal officer of the appellant corporation, violated the Due Process Clause of the Fourteenth Amendment when the Justice denied a recusal motion. The $3 million campaign contribution to the Justice exceeded the total amount spent by all other supporters of the Justice and by the Justice's own campaign committee. The West Virginia Supreme Court of Appeals reversed a trial

---

[25] Article 5, § 10 vests the Supreme Court with "supervisory administrative authority" over the courts of Pennsylvania. PA CONST., art. V, § 10(a).

court judgment against the appellant for $50 million. The vote to reverse was 3 to 2. Justice Benjamin voted with the majority. In his defense, Justice Benjamin reiterated he had no direct, personal, substantial, or pecuniary interest in the case. *Id.* at 876. Adopting a standard of appearances, he concluded, seemed little more than an invitation to subject West Virginia's justice system to the vagaries of the day. *Id.* The Supreme Court disagreed.

Before turning its attention to the constitutional issue to be decided, the *Caperton* Court first noted that, while it was axiomatic that a fair trial in a fair tribunal is a basic requirement of due process, most matters relating to judicial disqualification do not rise to a constitutional level. *Id.* Judicial reforms implemented by the states to eliminate even the appearance of impropriety, a standard more rigorous than due process, make resolution of most disqualification disputes under due process standards unnecessary. *Id.* at 889-90. "The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification[.]" *Id.* (quotation marks omitted).

In *Caperton*, the Supreme Court first reviewed the history of its recusal cases to demonstrate that the relevant inquiry under the Due Process Clause is an objective standard. *Id.* at 877-81. The Court found this necessary due to the difficulties of inquiring into a judge's actual bias

when the inquiry is often a private one. *Id.* at 883. A "judge's own inquiry into actual bias, then, is not one the law can easily superintend or review …." *Id.* Therefore, in lieu of appellate review of a judge's actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. *Id.* Under this objective standard, the Court found, despite Justice Benjamin undertaking an extensive search for actual bias, that when a person with a personal stake in a case had a significant and disproportionate influence in placing a judge on a case by raising funds or directing a judge's election campaign when a case is imminent or pending, due process is violated. *Id.* at 884. The Court dismissed concerns that its decision on due process grounds would flood the courts with recusal motions. *Id.* at 887. The case presented extreme facts that created an unconstitutional probability of bias. Significantly, to assuage these fears further, the Court, as noted *supra*, pointed to judicial reforms the States have implemented to eliminate the appearance of partiality by adopting the ABA's objective standard that "[a] judge shall avoid impropriety and the appearance of impropriety." *Id.* at 888. In this regard, the Court held that these codes of conduct serve to maintain the integrity of the judiciary and the rule of law. *Id.* at 889. The power and prerogative of a court to elaborate principles of law when resolving disputes rest, in the end, upon the respect accorded to its judgments. *Id.* at 889 (citing *Republican Party of Minn. v. White*, 536 U.S. 765, 793 (2002) (Kennedy, J., concurring)). The

citizen's respect for judgments depends in turn upon the issuing court's absolute probity. *Id.* "Judicial integrity is, in consequence, a state interest of the highest order." *Id.* For these reasons, the Court continued, States may choose to adopt recusal standards more rigorous than due process requires. *Id.*

It is thus clear from **Caperton** that when confronted with a request for judicial recusal, due process requires more than a jurist's examination of his or her conscience for bias. Due process requires a more objective standard. While exceeding minimal due process requirements, the appearance of impropriety, adopted by almost every state in its judicial code,[26] satisfies this objective requirement. Therefore, while Appellee is correct that litigants do not have standing to enforce our Code of Judicial Conduct, Appellee paints with too broad a brush by arguing that the appearance of impropriety under our Code also is not a part of our substantive law upon which litigants may rely when presenting a recusal motion. The Pennsylvania Supreme Court's announcement of a recusal standard in **Goodheart**, *infra*, is proof enough that the appearance of impropriety is a part of our substantive law.

In **Goodheart**, our Supreme Court, upon a motion for reconsideration, was asked to consider whether two of the Court's justices, as members of the class before the Court challenging a two-tiered compensation system for

---

[26] As of the time **Caperton** was decided almost every State had adopted the American Bar Association's objective standard of the appearance of impropriety. *Id.* at 888.

judges, should have participated in the Court's decision where it was asserted the two justices had direct interests in the case. Participation by the two justices was challenged under the Due Process Clause of the United States Constitution and Pennsylvania's Code of Judicial Conduct. The due process challenge was rejected, as the Court reasoned the votes of the two justices were surplusage. *Goodheart*, 565 A.2d at 761-62. Disposition of the challenge under Canon 3(C) of the Code of Judicial Conduct[27] also was dismissed. Even if there was a clear violation of the Code, the Court held this would not confer substantive rights upon the parties. *Id.* at 762. The power to address judicial violation of Code norms was a matter left entirely to the Supreme Court's constitutional supervisory authority.[28] *Id.* Notwithstanding the lack of any substantive rights in Canon 3(C) by the litigants, the Court held that when a judge conducts the self-assessment required when addressing a motion to recuse, Canon 3(C) provides some of the factors bearing upon that evaluation. Even though judicial discipline remains the province of the Supreme Court, the Court was careful to point out that, under our substantive law, a party to an action still has the right to request the recusal of a judge where the party has reason to question the

---

[27] The specific provisions of the prior Canon challenged in *Goodheart* can be found in current Rule 2.11 to Canon 1 of the current Code of Judicial Conduct that instructs "[a] judge . . . shall avoid impropriety and the appearance of impropriety."

[28] As noted earlier, the Supreme Court derives that authority from Article 5, § 10 of the state constitution. PA CONST., art. V, § 10(a).

- 14 -

impartiality of the judge in the case before the court. ***Id.*** The Court continued:

> Where there is a question of the impartiality of one or more of the Justices, it is the individual Justice's responsibility to make a conscientious determination whether he or she can impartially assess the issues in question. It is to be emphasized that this assessment is two tiered. First, whether the Justice would have a personal bias or interest which would preclude an impartial review. **This is a personal and unreviewable decision that only the jurist can make.** Second, whether his participation in the matter would give the appearance of impropriety. [T]o perform its high function in the best way, "justice must satisfy the appearance of justice."

***Id.*** at 764 (emphasis added) (quoting ***Offut v. United States***, 348 U.S. 11, 14 (1954)); ***see also Commonwealth v. Travaglia***, 661 A.2d 352, 370 (Pa. 1995). Thus, one can see that ***Goodheart*** incorporated the appearance of impropriety standard as a part of our substantive law in the second tier of its test. This is consistent with the Supreme Court's discussion in ***Caperton***, as the appearance of impropriety standard supplies a level of objective review to satisfy due process requirements. The trial court erred in disregarding this standard and by focusing solely upon actual bias.

### Proper Application of the Appearance of Impropriety Standard

Unfortunately, cases subsequent to ***Goodheart*** that have attempted to cite its recusal standard have contributed to confusion on whether a trial judge's decision may be subject to review. Notably, in the oft-cited case of ***Commonwealth v. Abu-Jamal***, 720 A.2d 79 (Pa. 1998), our Supreme Court stated:

- 15 -

>    As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. **This is a personal and unreviewable decision that only the jurist can make.**

*Id.* at 89 (citation omitted) (emphasis added).[29] The recusal standard as repeated in *Abu-Jamal* and cited ever since, contains a subtle and unexplained distinction from the Supreme Court's earlier pronouncement of this standard in *Goodheart*. The *Abu-Jamal* Court cited *Goodheart* with no apparent disapproval, but did not explain its transposition of the non-reviewability standard—applicable only to the first tier of *Goodheart*—to the second tier of the *Goodheart* test, where review of the appearance of impropriety standard is subject to an abuse of discretion review. It appears certain that this transposition is by mistake, because the evolution of this two-tiered approach is long standing.

---

[29] Pennsylvania Courts commonly and frequently cite the *Abu-Jamal* standard as well settled. *See, e.g.*, *Commonwealth v. Flor*, 998 A.2d 606, 641-42 (Pa. 2010), *cert. denied*, 131 S. Ct. 2102 (2011); *Commonwealth v. Miller*, 951 A.2d 322, 328 (Pa. 2008); *Commonwealth v. White*, 910 A.2d 648, 657 (Pa. 2006); *Commonwealth v. Tharp*, 830 A.2d 519, 534 (Pa. 2003), *cert. denied*, 541 U.S. 1045 (2004); *Commonwealth v. Melvin*, 103 A.3d 1, 23 (Pa. Super. 2014); *Commonwealth v. Kearney*, 92 A.3d 51, 60 (Pa. Super. 2014), *appeal denied*, 101 A.3d 102 (Pa. 2014); *Rohm & Hass Co. v. Lin*, 992 A.2d 132, 149 (Pa. Super. 2010); *Overland Enter. v. Gladstone Partners, L.P.*, 950 A.2d 1015, 1021 (Pa. Super. 2008); *Commonwealth v. Bonds*, 890 A.2d 414, 418-19 (Pa. Super. 2005), *appeal denied*, 906 A.2d 537 (Pa. 2006).

Under our substantive law, the appearance of impropriety alone is enough to warrant recusal under appropriate circumstances. Our case law has established that a judge's self-evaluation must yield when an appearance of impropriety is present. For example, in **In re McFall**, 617 A.2d 707 (Pa. 1992), the trial judge was cooperating with F.B.I. investigators seeking information on judges accepting gifts in return for the F.B.I.'s promise to divulge her cooperation in the event the judge faced prosecution for a gift she accepted from a potential litigant. *Id.* at 711. At the same time the trial judge was cooperating with the F.B.I., she was presiding over cases in which her potential prosecutors were prosecuting the appellees in an action. The appellant argued the trial judge's ability to maintain impartiality was not influenced because the appellees had not demonstrated the trial judge had a "direct, personal, substantial, pecuniary interest in the cases in which she presided," or in other words, appellees failed to demonstrate they were prejudiced. *Id.* at 714.

Our Supreme Court held the circumstances were such that it need not reach the issue of due process because it concluded the appearance of impropriety alone compelled it to grant new proceedings in view of the blatant potential conflict of interest of the trial judge. *Id.* at 712. The Court stated, "In order for the integrity of the judiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, **but the appearance of impropriety is sufficient.**" *Id.*

(emphasis added). "The appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of either of these elements." *Id.* at 713 (citing *Commonwealth v. Goodman,* 311 A.2d 652, 654 (Pa. 1973)). The Court expressly held there is no need to find actual prejudice; the appearance of impropriety is sufficient to warrant a new trial. *Id.* at 714. Therefore, the mere possibility that the trial judge may have treated the prosecutor's office in a way so as to maximize her chances for leniency was all that was needed to establish the appearance of impropriety. *Id.* A showing of actual bias was not required.

In *White*, the judge shared personal family information from the bench with a juvenile defendant and offered to get the defendant pizza during her incarceration. The trial court also expressed frustration with the existing law as applied to the defendant's case and expressed her intent not to be "boxed into treating this like a normal case." *White*, 910 A.2d at 657. The Majority[30] concluded the trial court erred in denying the Commonwealth's recusal petition, reasoning that the trial court's "denouncement of the very system in which an impartial jurist is one of the key components creates the appearance of impropriety." *Id.* at 658. The

---

[30] Justice Eakin authored the opinion announcing the judgment of the Court in *White*. He wrote for a four-Justice majority with regard to the merits of the Commonwealth's petition requesting the trial court to recuse.

trial court's "questionable conversation" with the defendant also added to the appearance of impropriety. *Id.*

In *Commonwealth v. Darush*, 459 A.2d 727, 729 (Pa. 1983), the defendant alleged the trial judge made derogatory remarks about the defendant while the judge was a district attorney. The trial court judge declined to admit or deny that he made the statement, claiming he had no recollection. *Id.* at 732. The court also assured the defendant he would receive a fair trial. *Id.* The Supreme Court discerned no evidence of bias and was convinced the judge acted with complete integrity. *Id.* at 729, 732. Nonetheless, the Court remanded for resentencing before a different judge:

> However, considering all the circumstances, especially the trial court's inability to affirmatively admit or deny making remarks from which **a significant minority of the lay community** could reasonably question the court's impartiality, we feel the largely unfettered sentencing discretion afforded a judge is better exercised by one without hint of animosity toward appellant.

*Id.* at 732 (emphasis added).[31]

---

[31] The revised Code of Judicial Conduct defines impropriety as follows:

> The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.

Pa. Code Jud. Conduct, Canon 1, Rule 1.2, cmt 5. As noted elsewhere in this opinion, this Court has no authority to enforce the Code of Judicial Conduct. In any event, I do not believe I need to address whether and to what extent the "reasonable minds" standard of the Code differs from the previous Code standard of a "significant minority of the lay community"

On the other hand, in **Commonwealth v. Druce**, 848 A.2d 104 (Pa. 2004), our Supreme Court affirmed the trial court's denial of a recusal motion where the court gave an interview to an Associated Press writer prior to imposing sentence in a widely publicized prosecution of a state legislator. In that interview, the judge called some of the defendant's claims "strange," but also indicated in that interview that public sentiment would not sway his handling of the case. **Id.** at 106-07. On the bench immediately before imposing sentence, the trial court told the defendant he held no bias, prejudice or ill will against him. **Id.** at 107.

The Supreme Court declined to create a *per se* rule requiring recusal in light of the trial court's ostensible violation of Canon 3A(6) of the Code of Judicial Conduct, prohibiting public comment about a pending case.[32] The Court noted that a *per se* rule would "remove any introspective discretion from the jurist." **Id.** at 109. "[T]his Commonwealth must continue to reserve faith in, and give due deference to our jurists, and allow them to address these initial challenges. Their discretion may of course be reviewed, but it must first be allowed to be exercised." **Id.** The trial judge in **Druce**

---

described in **Darush**. Pursuant to **Commonwealth ex. rel. Armor v. Armor**, 398 A.2d 173 (Pa. Super. 1978) (*en banc*) (plurality), and my analysis in the main text, I believe the circumstances of this case present an appearance of impropriety under substantive state law governing recusal. I do not believe that a judicial adoption of the "reasonable minds" standard of the Code would alter that result.

[32] The provision governing public comment on pending cases has been revised and renumbered as Rule 2.10 of the Code of Judicial Conduct.

asserted his impartiality, both in the public interview and from the bench in response to the petition to recuse. *Id.* at 110-11. Our Supreme Court affirmed the judge's denial of the recusal motion. *Id.* at 111.

Similarly, in *Travaglia*, the PCRA judge made disparaging comments about the petitioner after the close of petitioner's trial: "I am shocked that it takes 11 years in our judicial system to find an excuse to avoid the death penalty. If anyone deserves to die, these two individuals [the petitioner and his codefendant] do for killing four people for fun." *Travaglia*, 661 A.2d at 369 n.37. In an opinion addressing the recusal request, the PCRA judge wrote: "to say that the [c]ourt is highly dissatisfied with the present system of perpetual appellate activity is not to say that the [c]ourt would vent its frustrations by arbitrarily giving [the appellant's] current arguments less than the full and complete attention required by law." *Id.* The PCRA court therefore believed it could preside over the collateral review without creating an appearance of impropriety. *Id.* The Supreme Court was satisfied with the PCRA court's opinion addressing the petition to recuse, deeming it "thoughtful" and "detailed." *Id.* The Court therefore discerned no abuse of discretion in denying the recusal petition.

To summarize the foregoing, our courts have consistently held that recusal is warranted when actual impropriety is shown on the part of a jurist **or**, when appropriate, solely when an appearance of impropriety is present. In other words, I believe the standard set forth in *Goodheart* governs our

analysis, and that standard is well grounded in history and law. *Abu-Jamal* altered the *Goodheart* standard without explanation, but I do not believe *Abu-Jamal* created a substantive change to the analysis.[33] Numerous cases analyzed herein, both pre- and post-*Abu-Jamal*, support this conclusion.

## Appearance of Impropriety in this Case

I turn now to the trial court's recusal decision in this case. The standard guiding our review is if a judge feels he or she can hear and dispose of a case fairly and without prejudice, that decision will be final unless there is an abuse of discretion. *See Reilly*, *Goodheart*, *Abu-Jamal*, *supra*; *see also In re Crawford's Estate*, 160 A. 585 (Pa. 1931).

---

[33] It seems sensible to treat the "final and unreviewable" language as pertaining to the jurist's personal examination of his or her own motives and biases rather than the judge's decision on whether an appearance of impropriety exists. *See Caperton*, 566 U.S. at 883 ("The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules.").

Nonetheless, at least one three-judge panel of this Court has treated a trial court's decision on the appearance of impropriety as unreviewable. *Overland*, 950 A.2d at 1021. The *Overland* Court wrote, "As to the question of whether the specter of the appearance of judicial impropriety was raised by the nature of the pending controversy . . . our caselaw is clear that a jurist's decision on whether same exists is unreviewable." *Id.* (citing *Arnold v. Arnold*, 847 A.2d 674, 681 (Pa. Super. 2004)). The *Overland* Court's reliance on *Arnold* is misplaced. The appellant in *Arnold* argued the trial court's rulings against him evinced the court's bias. *Arnold*, 847 A.2d at 680. This Court merely held that adverse rulings alone are not evidence of bias, especially where those rulings were not legally erroneous. *Id.* at 681. The circumstances of *Arnold* are therefore distinct from *Overland* and from the matter on appeal. I would disapprove the *Overland* panel's statement on the reviewability of the appearance of impropriety.

The trial court prefaced its recusal analysis, citing ***Municipal Publications, Inc., v. Court of Common Pleas***, 489 A.2d 1286 (Pa. 1986), and ***Reilly***, with its statement that the Supreme Court of Pennsylvania promotes the standard of actual prejudice or bias in reviewing recusal proceedings. Trial Court Opinion, 12/31/08, at 10. From this the trial court denied Appellants' recusal motion, concluding the record did not show prejudice or bias or that Appellants did not receive a full, fair and impartial trial. ***Id.***

The trial court either read these cases too narrowly or read them improperly. The issue in ***Municipal Publications*** was whether the trial judge should be disqualified from ruling on a recusal motion when the trial judge was called as a material witness and gave testimony concerning his own conduct. These were unique circumstances that were heard, upon application, under the Supreme Court's plenary jurisdiction. Unlike the issue here, the Court emphasized it was not deciding whether the trial judge should be disqualified from presiding over the underlying matter. It was concerned only with whether the trial judge could rule upon the motion. The case is, therefore, inapposite.

***Reilly***, unlike ***Municipal Publications***, did concern a motion for recusal. The ***Reilly*** Court found the ***Crawford*** recusal standard still to be controlling. In ***Crawford*** the Court wrote:

> The proper practice on a plea of prejudice is to address an application by petition to the judge before whom the proceedings

are being tried. **He may determine the question in the first instance, and ordinarily his disposition of it will not be disturbed unless there is an abuse of discretion.**

**Due consideration should be given by him to the fact that the administration of justice should be beyond the appearance of unfairness**. But, while the mediation of courts is based upon the principle of judicial impartiality, disinterestedness, and fairness pervading the whole system of judicature, so that courts may as near as possible be above suspicion, **there is, on the other side, an important issue at stake; that is, that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice or unfairness made against the judge in the trial of a cause.** It is of great importance to the administration of justice that such should not occur. **If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion.** This must be so for the security of the bench and the successful administration of justice. Otherwise, unfounded and ofttimes malicious charges made during the trial by bold and unscrupulous advocates might be fatal to a cause, or litigation might be unfairly and improperly held up awaiting the decision of such a question or the assignment of another judge to try the case [].

**When a charge of disqualification is made against a trial or hearing judge, the party must produce evidence which has a tendency to show bias, prejudice or unfairness.** To sustain the charge, the exceptant is not limited to the instant case, but he may show personal ill will to client or counsel, or temperamental prejudice on the particular class of litigation involved, or any other recognized ground.

*Crawford*, 160 A. at 587 (emphasis added). The *Crawford* Court's analysis of the interplay between avoiding the appearance of unfairness (or impropriety) while affording appropriate deference to jurists remains prescient. It did not hold, as the trial court suggests, that review for an appearance of impropriety may be dispensed with so long as the record did

not show prejudice or bias or that Appellants did not receive a full, fair and impartial trial.

Turning now to the circumstances of the instant appeal, the record reflects the following exchange between Appellants' counsel and Judge Branca on the second and final day of the damages trial that prompted the recusal issue:

> Q.    You mentioned you were given updates [from Appellee's counsel]?
>
> A.    Yeah.
>
> Q.    And what were the reasons for these updates?
>
> A.    Because I had an interest in the case, I have a financial interest in the case, I have – I'm entitled to a referral fee.  And so to the extent that I'm entitled to a referral fee, I'm entitled to know something about what's happening with the case, not only for my information but also for purposes of my disclosing whatever I might need to disclose if and when I get a fee.
>
> Q.    What is the nature of that financial arrangement, Your Honor?
>
> A.    It's a very interesting one, I guess, because what happened was when I referred the case to Paul Rosen, I told him that he should sit down and work anything out with Roy that they think is appropriate and fair for a referral fee.  And, ultimately, as I now just understand it from Mr. Lomas, he sent a letter to Rosen to tell Rosen that if, in fact, they collect any money, I should get a third referral of the net proceeds as a fee.

N.T., 9/6/07, at 21-22.

As recited above, this exchange clearly demonstrates that Judge Rogers presided over the damages phase of these proceedings at a time when he knew Judge Branca, a judicial colleague of his on the Montgomery

County bench, would directly and proportionally benefit from the size of any increased award entered in the case. Upon these facts, I find our prior *en banc* decision in **Armor** to be persuasive.

In **Armor**, under very similar circumstances to the instant case, this Court mandated recusal of the entire Montgomery County trial court bench (or a change of venue) where the spouse of one of the judges had a financial interest in a child support case pending in Montgomery County. As is claimed here, the record evinced no evidence of "bias, prejudice or unfairness" on the part of the presiding judge, but this Court found the appearance of impropriety to be an overriding concern:

> [T]he judicial system must be kept, like Caesar's wife, above reproach. Under the circumstances here presented, the appearance of appellee before the bench of Montgomery County, involving as it must her remarriage to a member of that bench, demands that such a case not be heard by any of the judge-husband's colleagues.

**Armor**, 398 A.2d at 174. Accordingly, this Court refused to approve a procedure whereby any of the Montgomery County Common Pleas judges could hear the matter. All of the judges of that county court would have the same problem as the then-presiding judge. It was our conclusion that such action would tend to weaken the public confidence in the court. **Id.** Importantly, we also held that such action would, pursuant to Canon 1 of the Code of Judicial Conduct, be contrary to the appearance of impropriety and independence of the judiciary that we are charged with preserving. **Id.** Likewise, we held that such action would violate the judge's obligation to

promote public confidence in the integrity and impartiality of the judiciary pursuant to Canon 2.[34] *Id.*

Given the facts in *Armor*, I cannot distinguish its result from what should occur in this case. The disqualifying feature in this case is Judge Branca appearing before his colleague on the Montgomery County bench. Every member of that bench would be placed in identical circumstances as Judge Rogers to decide damages knowing that Judge Branca would benefit directly and proportionally from the size of any award. The appearance of impropriety here—perceived favoritism of a judicial colleague—reflects adversely on a judge's impartiality and the integrity of the judiciary. In fact, I find a bench recusal here more compelling than in *Armor*, since the perceived favoritism here is of a judicial colleague, as opposed to that of a judicial family member, as was the case in *Armor*. In this regard, I also find the trial judge's focus on the conduct of Judge Branca to be irrelevant to the decision on recusal. While Judge Branca's prior representation of Appellee may have formed the factual predicate for the recusal motion, the appearance of impropriety to be reviewed had to focus upon whether Judge Rogers, the trial judge, should sit in judgment of this case.

*Armor* illustrates again that a jurist's recusal is sometimes necessary to protect the integrity of the judicial system. This is a common theme for courts facing this issue. "A tribunal is either fair or unfair. There is no need

---

[34] That obligation is currently codified in Canon 1, Rule 1.2.

to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings. A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety." **McFall**, 617 A.2d at 714. I believe the trial court erred by disregarding consideration of the appearance of impropriety and focusing instead only on whether Appellants had demonstrated actual prejudice or bias by Judge Rogers.

## Our Supreme Court Has Not Disapproved Armor's Rationale

The trial court dismissed **Armor** believing that the Pennsylvania Supreme Court rejected its "imputed appearance of impropriety standard"[35] when that Court reversed **In re Brockerman**, 480 A.2d 1199 (Pa. Super. 1984). Trial Court Opinion, 12/31/08, at 10.[36] Appellee agrees, arguing subsequent cases have ignored **Armor** and have held that evidence of bias,

---

[35] It is not readily apparent how the trial court came to refer to the appearance of impropriety standard as "imputed." For present purposes, I discern no difference in my reference to the standard from that of the trial court.

[36] The trial court wrote as follows:

> No appearance of impropriety exists or is presumed to exist simply because a Judge of the Court of Common Pleas of Montgomery County has an interest in the underlying case. The Judge is not even a party in the case. **Armor** is not precedential authority and has been rejected by the Supreme Court. Moreover, **Armor** fails to set forth and articulate the substantive law and burden of proof to be applied on a motion for recusal.

Trial Court Opinion, 12/31/08, at 13.

prejudice or unfairness is necessary before the interest of a non-presiding judge requires recusal of all judges of the same court. Based on a thorough review of the law of recusal and the appearance of impropriety, I disagree.

In **Brockerman**, one party alleged the negligence of an attorney who, by the time of the appeal, was a judge of the Superior Court. **Id.** at 1201 n.3. Pursuant to **Armor**, this Court certified the appeal to the Supreme Court, believing that an appearance of impropriety precluded this Court from deciding the appeal. **Id.** In a *per curiam* order, the Supreme Court remanded to this Court without hearing the appeal. **In re Brockerman**, 473 A.2d 1016 (Pa. 1984). From this, the trial court inferred the Supreme Court's disapproval of **Armor**.

The trial court erred in its analysis of **Armor** as affected by **Brockerman** for several reasons. First, and most important, *per curiam* orders do not create binding precedent. **Beneficial Consumer Discount Co. v. Vukman**, 77 A.3d 547, 549 n.3 (Pa. 2013). The Supreme Court's order in **Brockerman** is not authoritative on any substantive issue in that case. The trial court erred in treating the *per curiam* order in **Brockerman** as a rejection of **Armor**. I will not speculate as to the Supreme Court's reasons for refusing this Court's certification of the appeal. I believe, nonetheless, that the circumstances of **Brockerman** were very different from those of **Armor**. Second, as evinced throughout this opinion, **Armor** plainly is not the only case to apply the appearance of impropriety standard.

A rejection of **Armor**, even if one occurred, would not be a rejection of the appearance of impropriety standard. It cannot seriously be contended that our Supreme Court intended, through a *per curiam* order, to create a sea change in this area of the law. Finally, as Appellants point out, the Supreme Court, after **Brockerman**, also issued a *per curiam* order in **Highway Materials, Inc., v. Court of Common Pleas of Montgomery County**, No. 156 MM 2010, 2010 Pa. LEXIS 2874 (Pa. Dec. 14, 2010), where it ordered a full bench recusal of the trial court. This would seem at odds with the Court's action in **Brockerman**. It is not, however, for the same reason **Brockerman** does not control here; neither case creates binding precedent.

**The Timing of Appellants' Recusal Motion**

The Majority argues Appellants' recusal motion was untimely as they had two opportunities to seek recusal before they filed their motion; first before the liability trial in January 2007, and second, on September 6, 2007 immediately after Judge Branca testified. I disagree.

The parties' consent at the January 2007 pretrial conference to proceed in front of Judge Rogers is of no moment for two reasons. First, the result I advocate would not disturb the liability verdict from these bifurcated proceedings. Second, the parties and the trial court were unaware of Judge Branca's financial interest in the outcome of this case until Judge Branca's

testimony on the second and last day of the damages trial.[37]  Any analysis of

the timeliness of Appellee's motion must therefore commence from that

date.

Citing **In re Lokuta,** 11 A.3d. 427 (Pa. 2011), **Goodheart** and **Reilly**,

the Majority states that it is well settled that "a party seeking recusal or

disqualification [is required] to raise the objection at the *earliest possible*

*moment*, or that party will suffer the consequence of being time barred."

Majority Opinion at 21 (emphasis added by the Majority).[38]  While I do not

_____

[37]  The Majority states that Appellants could have learned of Judge Branca's financial interest by taking his deposition or informally "just asking him." Majority Opinion at 22-23.  The Majority fails to cite any information in Appellants' possession that would prompt such an inquiry.  Appellee did not reveal at the January 2007 pretrial conference that Judge Branca retained a one-third contingent fee interest in the outcome of the case.  Appellants' Memorandum of Law in Support of the Motion for Recusal, 6/24/09, at 3.

[38]  The Majority argues the Appellants' failure to request recusal immediately after Judge Branca's testimony was a waiver of any right to request recusal. The record reveals that in his response to Appellants' recusal motion, Appellee's only objection to the propriety of Appellants' motion being before the trial court was that Appellants waived any right to request recusal based upon the January pretrial proceedings.  Appellee's Memorandum in Opposition to Defendants' Motion for Recusal, 10/24/07, at 13.  At the pretrial conference, Judge Rogers disclosed (1) Judge Branca's prior representation of Appellee, and (2) the absence of any discussion of this cases between Judge Rogers and Judge Branca, whereupon all counsel agreed Judge Rogers could preside.  **Id.**  The key point, however, is the absence of any disclosure, prior to Judge Branca's testimony during the damages trial, of Judge Branca's financial interest in the outcome of this case.  Nonetheless, the Majority's reliance on waiver is permissible as this Court may affirm the trial court on any valid basis, including waiver.  **See Commonwealth v. Tunnell**, 345 A.2d 611, 612 (Pa. 1975) ("While the question of waiver has not been raised by any party to this litigation, this Court may affirm an order if it is correct for any reason.") (citing **Gilbert v. Korvette**, 327 A.2d 94, 96 n.5 (Pa. 1974)).

quibble with this general proposition, none of these cases is particularly helpful in addressing the timeliness issue raised by the Majority. In **Lokuta, Goodheart** and **Reilly**, the recusal motions were all held to be untimely because the moving litigants waited until the outcome of their cases before filing their motions. In **Lokuta**, the appellant, after trial, sought recusal of one of the judges of the Court of Judicial Discipline on the basis the judge was ineligible to serve on the court. The appellant raised this issue after trial and had not included this argument in other pre-trial requests for recusal. **Lokuta**, 11 A.3d at 437. Citing **Goodheart**, the **Lokuta** Court held the appellant had waived this issue for not having raised it at the earliest opportunity. **Id.**

In **Goodheart**, the appellants, after they lost on appeal to our Supreme Court, in an application for reconsideration, moved for recusal of two Justices they alleged would benefit by the claim asserted in that case. In their opposition to the application, the appellees asserted that the "[A]ppellant chose to remain silent, resorting to the unconscionable and reprehensible tactic of laying in the grass, waiting until the decision and then raising the disqualification issue only if they lost." **Goodheart**, 565 A.2d at 763.[39] Although this characterization was somewhat "florid," our Supreme

---

[39] The Majority's use of this quotation from **Goodheart** inexplicably adds to and truncates that court's statement regarding the timeliness of a recusal motion when the Majority states "Appellant[s] chose to remain silent…waiting until the decision **[was imminent]**, and then raising the disqualification issue[.]" Majority Opinion at 23. In fact, as fully quoted

Court held that it could not say the characterization was either inaccurate or unfair. *Id.* Since the facts suggesting disqualification were known when the case was called for argument, the issue was deemed waived.

Similarly, in *Reilly*, counsel for the appellant, SEPTA, raised grounds for recusal of the trial judge a) eight months after the trial judge gave counsel five days to file a recusal motion, and b) in asserting numerous new grounds for recusal while on appeal to this Court. *Reilly*, 489 A.2d at 1300. The Supreme Court found that counsel waived any right to raise recusal by not timely responding to the trial judge's order and for raising new grounds after trial was complete on appeal to this Court. *Id.* Although *Lokuta*, *Goodheart* and *Reilly* all speak to the timeliness of a recusal motion, they provide little guidance to the present situation where the grounds for recusal were in fact raised **before** a verdict was entered by the trial court.

Judge Branca testified on September 6, 2007, the last day of the two-day damages trial. Appellants filed their recusal motion on October 15, 2007. Appellants did not await the adverse damages verdict before filing their motion. Appellants retained new counsel and sought Judge Rogers'

---

above, the statement from *Goodheart* provides "[A]ppellant chose to remain silent…waiting until the decision and then raising the disqualification issue **only if they lost**." *Id.* (Emphasis added). By indicating the moving party waited until the decision was "**imminent"** and omitting the words "**only if they lost**", the Majority impermissibly changes the import of this statement in *Goodheart*. In fact, the Majority's statement becomes incongruent with the facts and result in that case where the recusal motion was deemed waived because the appellants waited until the court's decision was issued before requesting recusal.

recusal prior to the trial court's damage verdict. Thus, Appellants have not violated the precedent prohibiting a recusal motion after an adverse result. Appellants' filed their motion during the thirty-day post-trial hiatus granted by the trial court to permit Appellants to determine whether they needed a forensic accountant to review attorneys' fee invoices submitted by Appellee at the beginning of the damages trial. Certainly, the surprise revelation that Judge Branca retained a contingent fee interest in the outcome of this case to be decided by his colleague, was a momentous matter that had to be carefully considered by Appellants. The decision to seek recusal not only of Judge Rogers, but of the entire Montgomery County bench, assuredly required counseled judgment. This situation is entirely distinct from a common evidentiary objection that requires immediate action to afford the trial court an opportunity to correct a perceived error. Moreover, Appellants filed the motion before any additional days of trial (as there were none) or courtroom resources were devoted to this matter and before the trial court's decision on damages. Under these circumstances, I do not believe that Appellants' motion was untimely filed.

I also reject the Majority's claim that the loss of the trial judge that made the credibility decisions and observations of witnesses and other evidence at trial will cause extreme prejudice to the Appellee. This contention is belied by Appellee's own concession that another trial judge could decide the damages trial based upon a review of the existing record if

Judge Rogers found that he had to recuse himself from this case. Appellee's Memorandum in Opposition to Defendants' Motion for Recusal, 10/24/07, at 1, 4, 14.[40] Moreover, the Majority's contention applies to any case where a trial judge finds that he or she must recuse during the course of a proceeding. Such is the price to be paid for the guarantee of a fair trial and the preservation of the public's trust in the judiciary's administration of justice.

## Conclusion

In conclusion, I do not believe this Court can defer to Judge Rogers' disposition of the recusal motion. Judge Rogers failed to account for the appearance of impropriety inherent in this case. Judge Branca testified that he has a one-third interest in the net proceeds of any award in this case, and Judge Rogers, presiding over a bench trial, was responsible for determining the amount of the award. Appellee notes that Judge Rogers issued a verdict on liability before this issue arose, and the amount of compensatory damages had been established through arbitration. This point is well-taken, but at the damages phase in this action Judge Rogers had to determine whether and to what extent, in his discretion, punitive damages were appropriate. Judge Rogers' award of more than $600,000.00 in

---

[40] I acknowledge that after Judge Rogers vacated his recusal after considering Appellee's response, Appellee has maintained that Judge Rogers did not abuse his discretion in refusing to recuse himself from this matter, and now Appellee objects to another judge being assigned to hear this case.

punitive damages essentially may award his colleague on the Montgomery County bench more than $200,000.00 on this item of damages alone.[41]  In *Armor*, we ordered the recusal of the entire Montgomery County bench where a judge's spouse had a direct financial interest in the outcome.  I believe the same result must obtain here, where a judge has a direct financial interest in the outcome of a case being heard and decided by one of his bench colleagues.

As demonstrated, an appearance of impropriety alone may properly form the basis for recusal of a judge, or bench, from hearing a matter. Judge Rogers improperly has dismissed consideration of the appearance of impropriety in this case solely on the basis Appellants produced no evidence of bias, unfairness, or prejudice on the part of Judge Rogers.  To do so disregards a critical gatekeeping function of our courts.  As aptly observed in *Reilly*,

> Questions concerning the fairness, impartiality, or bias of the trial court always affect the administration of justice and can cloak the whole system of judicature with suspicion and distrust. Because recusal requests call into question our ability to mediate fairly, they raise important issues in which the public is concerned.  If our courts are perceived to be unfair and biased, our future ability to adjudicate the public's grievances and wrongs will be threatened, because we all lose the one thing that brings litigants into our halls of justice—their trust.  Without the people's trust that our decisions are made without malice, ill-will,

---

[41]  The record is not clear as to what a referral fee of one-third on a net recovery would include under the agreement between Judge Branca, the client, and the referred firm.  Suffice it to say, the increase in award of more than eight times the arbitration award because of Judge Rogers' decision on damages is substantial.

> bias, personal interest or motive for or against those submitting to our jurisdiction, our whole system of judicature will crumble.

*Id.* at 1301. "Judicial integrity is, in consequence, a state interest of the highest order." *Caperton* 556 U.S. at 889 (citing *Republican Party of Minn.*, 536 U.S. at 793 (Kennedy, J., concurring)).

Finally, I take issue with the Majority's contention that my analysis would require recusal of an entire county bench when a judge has a financial interest in a case pending in his or her home county, even in counties with large benches such as Allegheny and Philadelphia. Majority Opinion, at 2-3 n.1. I believe the Majority's claim is overstated and an unwarranted exaggeration of the result I advocate. This case presents extraordinary circumstances, and my analysis would create no blanket rule. The outcome of a recusal motion in any future case involving judges of the same county would still depend on the court's assessment of the facts and circumstances before it, in accordance with the law governing recusal motions. Instantly, Judge Branca was a material witness in the damages phase of this trial, and he had a significant financial interest in the outcome. Judge Rogers, a colleague, had to assess Judge Branca's credibility and determine whether to issue a substantial award of punitive damages knowing that Judge Branca would benefit proportionally based upon his contingent interest in the size of the award entered by Judge Rogers. These are the unique facts of this case, which I anticipate will not replicate themselves with any untoward frequency in our courts. With that said, I wish also to emphasize, once again, that I do

not doubt Judge Rogers' ability to arrive at a fair and impartial verdict.  My analysis rests on the appearance of impropriety, not actual impropriety.

As set forth at the outset, I join the Majority in affirming the liability verdict, and respectfully dissent from the Majority's conclusion that Judge Rogers did not err in denying Appellant's recusal motion.

Judges Bowes, Donohue, and Shogan join this Concurring and Dissenting Opinion.